216

## LUCIA CHASE EWING, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 25111.   Promulgated April 30, 1953.

*Randolph E. Paul, Esq.,* and *Eugene H. Lattin, Esq.,* for the petitioner.

*John J. Madden, Esq.,* and *John J. O'Toole, Esq.,* for the respondent.

218

222

228

**OPINION.**

ARUNDELL, *Judge:* The basic question before us is the deductibility of unrecovered sums advanced by the petitioner to The Ballet Theatre, Inc., her controlled corporation, for the production of ballet. The sum of $203,789.81,[6] the amount in question for the year 1942, was advanced by the petitioner indirectly through High Time Promotions, Inc., her wholly owned corporation, and the sum of $140,630.22, the amount in question for the year 1943, was advanced by the petitioner directly. Under the terms of the agreements with The Ballet Theatre, Inc., the right to the recovery of these sums was lost in the years 1942 and 1943 when The Ballet Theatre, Inc., incurred losses.

In her original petition, the petitioner claimed the amounts as worthless debts under section 23 (k). In an amended petition and on brief, she seeks the deduction of the amounts under section 23 (e) (2) as a loss incurred in a joint venture with The Ballet Theatre, Inc., for

---

[6] While the respondent makes no particular objection to the amounts the petitioner seeks to deduct, it seems that $203,435.05 was the amount which became unrecoverable from The Ballet Theatre, Inc., in 1942.

the production of ballet at a profit. She does not, however, abandon the worthless debt theory but argues it alternatively.

For reasons set forth in our recent opinion in *Evans Clark*, 18 T. C. 780, we cannot sustain the petitioner on the worthless debt theory. As explained in that case, a debt within the meaning of section 23 (k) does not arise where the obligation to repay is subject to a contingency that has not occurred. With reference to the worthless debt deduction claimed for 1943, it is clear from the petitioner's agreement with The Ballet Theatre, Inc., that the latter was not obligated to repay the sums advanced by the petitioner unless it earned profits during the 1942–1943 season. This contingency never occurred and, therefore, there never came into being a debt. Instead, losses were sustained during that season and The Ballet Theatre, Inc., was thereupon absolved of any obligation to make repayment at any time. Since no debt ever came into existence, the sum claimed for 1943 is not deductible under section 23 (k) as a debt that became worthless during the taxable year 1943.

A similar contingency existed with reference to the advances received by The Ballet Theatre, Inc., for the previous 1941–1942 season. It is true that the advances came directly from High Time Promotions, Inc., the money having been turned over to the latter by the petitioner for the sole and only purpose of using the funds as advances to The Ballet Theatre, Inc. Indeed, petitioner herself testified that High Time Promotions, Inc., was a mere conduit to so channel her funds. In these circumstances, respondent would completely disregard High Time Promotions, Inc., and treat the advances for the 1941–1942 season as being made directly by petitioner to The Ballet Theatre, Inc. Counsel for the petitioner does not directly argue to the contrary and, in fact, in advancing his major argument that petitioner was engaged in a joint venture, he would treat the advances as having been made directly by petitioner to The Ballet Theatre, Inc.

Whether or not High Time Promotions, Inc., is to be recognized, the same contingency prevails for the year 1941–1942 as for 1942–1943. While there appears a statement in the contract between petitioner and High Time Promotions, Inc., that the sums advanced would be repaid on a day certain, the very same agreement relates that the money advanced by the petitioner to High Time Promotions, Inc., would be turned over to Ballet Theatre on terms which make its repayment dependent on the making of profits. With High Time Promotions, Inc., only a conduit for petitioner's venture, it is obvious that any repayment to her was purely contingent. To view these contracts as providing otherwise would be entirely unrealistic.

We think, therefore, that the reasoning in *Evans* v. *Clark, supra*, is equally applicable to the advances for the 1941–1942 season. No debt was created and there was no bad debt to be deducted.

We turn now to the principal argument. The petitioner contends that the sums advanced in 1941–1942 and 1942–1943 represented her contributions to a joint venture with The Ballet Theatre, Inc., for the production of ballet and their loss is deductible under section 23 (e) (2)[7] as a loss incurred in a transaction entered into for profit. The respondent denies the existence of a joint venture relationship and also contends the petitioner's primary motive or intent in advancing the funds was not profit.

The legal relation known as a joint venture has been developed by American courts and is of comparatively recent origin. 48 C. J. S., Joint Adventures, secs. 1 and 2. It has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation," and also as "an association of persons to carry out a single business enterprise for profit." 48 C. J. S., *supra*, sec. 1. See also *Alger Melton*, 7 B. T. A. 717, 723; *McCausey* v. *Burnet*, 50 F. 2d 491; *Chase S. Osborn*, 22 B. T. A. 935, 945.

Under section 3797,[8] Internal Revenue Code, a joint venture is one of the various unincorporated associations included within the definition of a partnership. In *Commissioner* v. *Culbertson*, 337 U. S. 733, where the existence of a family partnership was in issue, the Supreme Court stated that the question whether a partnership is real for income tax purposes depends upon the intention of the parties and their intention is a question of fact to be resolved by considering all the facts, including the agreement and conduct of the parties. We think these principles are equally applicable here where the kind of partnership in question is an alleged joint venture.

In support of the contention that she was engaged in a joint venture with The Ballet Theatre, Inc., the petitioner argues that a joint venture was created by agreements with that corporation dated October 9, 1941, and October 2, 1942, which are set forth in detail in our Find-

---

[7] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

\* \* \* \* \* \* \*

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; \* \* \*

[8] SEC. 3797. DEFINITIONS.

(a). When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

\* \* \* \* \* \* \*

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

ings of Fact. She contends The Ballet Theatre, Inc., contributed valuable theatre properties to the alleged venture and she supplied most of the funds; that these funds were not for the unrestricted use of the corporation but only for the production of ballets; and also that there was to be a sharing of profits.

After giving careful consideration to these contentions and examining all of the evidence, we are of the view that the record does not support the petitioner but, on the contrary, establishes that the petitioner and The Ballet Theatre, Inc., did not intend to and did not in fact enter into a joint venture or partnership or any form of unincorporated organization such as is set forth in section 3797.

Throughout the agreements and correspondence between the petitioner and The Ballet Theatre, Inc., there is no mention of a joint venture and the petitioner's advances are referred to as loans. In fact, the agreements for the 1941–1942 and the 1942–1943 seasons expressly provide that "This agreement is not intended to create any partnership between the parties hereto."

Another factor evidencing intent is the provision for losses. *Roland P. Place*, 17 T. C. 199, affd. per curiam (C. A. 6, 1952) 199 F. 2d 373, certiorari denied 344 U. S. 927; *Joe Balestrieri & Co.* v. *Commissioner* (C. A. 9, 1949), 177 F. 2d 867; 48 C. J. S., *supra*, sec. 2. Under the contracts with The Ballet Theatre, Inc., the petitioner in effect undertook to and did make good all losses incurred by The Ballet Theatre, Inc., during the years in question except for relatively small amounts that were made good by advances from others. In fact, rather than sharing in losses, The Ballet Theatre, Inc., received additional assets without a corresponding increase in liabilities, since part of the advances were used to acquire ballet properties that became the sole property of The Ballet Theatre, Inc., and could be used for more than 1 season. These expenditures were referred to as "production costs."

Although the petitioner in effect made good the losses incurred by The Ballet Theatre, Inc., her agreements with The Ballet Theatre, Inc., were such that aside from the sums advanced, she was not personally liable for the obligations it incurred. The express provision of the agreements disavowing the partnership relationship might well have been included as further evidence of the absence of liability on the part of the petitioner.

The petitioner's subordinate position with reference to profits is also significant. The contracts with The Ballet Theatre, Inc., provided that the petitioner was to recover these advances and to receive a return on them measured by only one-half of the "operating profits" of The Ballet Theatre, Inc., for the particular season. As defined in the contracts, "operating profits" meant the sum remaining after gross receipts were reduced by production costs and expenses.

Moreover, The Ballet Theatre, Inc., was the sole owner of the Ballet Theatre dance company and any profits inuring to The Ballet Theatre, Inc., from the performances belonged to it alone. The petitioner's only right was to recover her advances and to receive compensation for the use of the advances, both of which were to be measured by the amount of the profits, if any. *Sugg* v. *Hopkins*, 11 F. 2d 517, 519, and cases cited therein; cf. *Plains Realty Co.*, 31 B. T. A. 412; *Mariani* v. *Summers*, 52 N. Y. S. 2d 750 (S. Ct. N. Y. Co., 1944), affd. 269 App. Div. 840, 56 N. Y. S. 2d 537 (1st Dept., 1945).

The conduct of the parties and the manner in which they regarded their relationship subsequent to the execution of the agreements is further evidence that they were not joint venturers. There were no books of account kept by an alleged joint venturer or any entries or accounts on the books of The Ballet Theatre, Inc., appropriate to a joint venture relationship. These advances were entered as "loans" on the books of The Ballet Theatre, Inc., and on its balance sheets. The financial result of the operation was recorded on the same books of account of The Ballet Theatre, Inc., as used in previous years when the corporation was not allegedly a joint venturer and the losses were recorded as losses of The Ballet Theatre, Inc., not as losses of a joint venture. No partnership returns were filed as is required of a joint venture. *L. C. Olinger*, 10 T. C. 423. In the exclusive management contract with Hurok Attractions, Inc., The Ballet Theatre, Inc., made no reference to the joint venture. The petitioner exercised no control over the business activities and took no part in the management and there is no evidence that she had any right to do so other than as a stockholder and director in The Ballet Theatre, Inc. The petitioner testified that she had nothing to do with the control of business affairs. Cf. *Joe Balestrieri & Co.* v. *Commissioner, supra.*

In setting forth these factors, it is not our view that as a matter of law each is indispensable to the formation of a joint venture. In some jurisdictions, for example, it is not essential that there be a sharing of losses. 48 C. J. S., *supra*, sec. 2; *Orvis* v. *Curtiss*, 157 N. Y. 657, 52 N. E. 690; *Mariani* v. *Summers, supra*; *Usdan* v. *Rosenblatt*, 93 N. Y. S. 2d 862 (S. Ct. N. Y. Co., 1949). However, the characteristics referred to above are commonly found in bona fide joint ventures and their presence or absence in any particular case is a fact which, in accordance with *Commissioner* v. *Culbertson, supra*, may be considered in resolving the question of intent to determine whether there is a real joint venture relationship for income tax purposes.

Finally, we come to the requirement relating to the petitioner's motive or intent in making the cash advances, a requirement basic

to the allowance of a loss deduction under section 23 (e) (2) regardless of whether the petitioner contends the losses were incurred in a joint venture or in any other relationship.

Section 23 (e) (2) allows the deduction of losses only if they are incurred in a "transaction entered into for profit." That is, no loss is deductible under this provision if the taxpayer engaged in the transaction merely or primarily for pleasure such as farming for a hobby, or primarily for such other purposes devoid of profit motive or intent, such as promoting charitable enterprises or obtaining the benefits of financial security by the purchase of an annuity. *Morton* v. *Commissioner*, 174 F. 2d 302, certiorari denied 338 U. S. 328; *Thacher* v. *Lowe*, 288 Fed. 994; *Lihme* v. *Anderson*, 18 F. Supp. 566; *Coffey* v. *Commissioner*, 141 F. 2d 204, affirming 1 T. C. 579; *John Randolph Hopkins*, 15 T. C. 160; *Frederick H. Wood*, 34 B. T. A. 1252; *Early* v. *Atkinson*, 175 F. 2d 118; see *Helvering* v. *National Grocery Co.*, 304 U. S. 282; *Weir* v. *Commissioner*, 109 F. 2d 996, certiorari denied 310 U. S. 637. Not only must the earning of profit be the taxpayer's motive or intent but, in addition, that motive must be the primary purpose for engaging in the transaction and it is not sufficient if it is merely incidental or subordinate to other purposes. *Lihme* v. *Anderson*, *supra*; *Coffey* v. *Commissioner*, *supra*; *John Randolph Hopkins*, *supra*; see *Helvering* v. *National Grocery Co.*, *supra*; *Weir* v. *Commissioner*, *supra*. In short, the profit motive must be the "prime thing." *Lihme* v. *Anderson*, *supra*.

The respondent contends the petitioner did not advance the sums primarily for the purpose of earning a profit in the production of ballet but for the primary purpose of satisfying her desire to see the ballet flourish in some form as an art in America. After carefully studying all the evidence and giving due weight to the testimony of the petitioner, as well as the contracts pursuant to which she advanced the sums, we have concluded that during the years in question the petitioner did not finance the production of ballet primarily for the purpose of earning a profit.

For many years the petitioner has been a principal dancer in the Ballet Theatre dance company. She is devoted to the art of ballet and anxious to develop that art in America. Commencing in 1937, she advanced large sums of cash for the production and presentation of ballet performances.

Beginning with her first advances in 1937, the petitioner has suffered continuous losses. Since that time, up to and including the 1941–1942 and 1942–1943 ballet seasons before us in this proceeding, the ballet company or companies in which she has been financially, artistically, and professionally interested have been financial failures. Never at any time had they even nearly achieved financial success or

at least indicated a pattern of decreasing losses. Each year substantial losses were suffered and there was not, by the time the advances in question were made, anything but highly speculative reasons for concluding that financial failures would not occur again as they in fact did. Nonetheless the petitioner advanced sums as high as $50,000 at a time during the seasons in question and there is no evidence that she ever refused to make advances when asked to do so or that she advanced any substantial sum for the promotion of any other theatrical enterprise. As stated by the Circuit Court of Appeals for the Second Circuit, in *Morton* v. *Commissioner*, *supra*, p. 304:

It is true that a record of continual losses over a series of years does not in itself preclude the allowance of such losses as a business expense. The intent of the taxpayer in making his expenditures is what counts; but the continuing lack of profits is an important factor bearing on the taxpayer's true intention.

Cf. *Thacher* v. *Lowe, supra.*

Despite the continued losses, the petitioner apparently gave little or no attention to the business management of The Ballet Theatre, Inc., and we cannot find sufficient indication that she made the inquiries which would have been made as a matter of course if her primary interest was financial gain. She seems to have made advances as the needs of The Ballet Theatre, Inc., developed and almost entirely at the request of the corporation's business managers. Some of the advances were made at a time during the financially unsuccessful seasons when the performances were about to be discontinued because of the lack of funds.

We think the terms of the agreements under which the petitioner advanced these funds to her controlled corporation, The Ballet Theatre, Inc., is further evidence bearing on her primary motive or intent. The advances were to be repaid only out of one-half of "operating profits" for the particular season, and to the extent that these profits were insufficient for that purpose, the petitioner lost all right to recovery. The Ballet Theatre, Inc., was absolved of all liability to make repayment even though it might earn a substantial profit in subsequent seasons.

Moreover, as previously explained, the "operating profits" upon which the petitioner's recovery as well as gain depended were computed by deducting from gross receipts not only expenses, referred to as preliminary, running, and other expenses, but also the cost of ballet properties which became the sole property of The Ballet Theatre, Inc., and could be used for more than 1 season. The effect of this arrangement was that part of the sums which the petitioner seeks to deduct for income tax purposes represents expenditures for assets that became the property of petitioner's controlled corporation. These expenditures totaled approximately $78,000 for the 1941–1942 season and approximately $64,000 for the 1942–1943 season.

We think it is relevant to inquire why the taxpayer agreed to such a subordinate position as to recovery of her advances as well as gain when the undertaking was financed mainly with her cash advances totaling approximately $203,000 in 1 year and $140,000 in the next, and The Ballet Theatre, Inc., supplied assets valued at approximately $100,000 with possibly only scrap value upon liquidation. It is also noteworthy that despite this disparity in the value of the respective contributions, petitioner could share in only one-half of the "operating profits" and, further, this proration remained the same from 1 season to the next despite the fact that the amount of her cash advances varied. When we take into consideration the fact that this was not an arm's length transaction in which the taxpayer obtained the best bargain she could but, rather, is one in which the taxpayer is dealing with her dominantly controlled corporation,[9] we think there is present a further reason for concluding that in advancing the sums her primary motive or intent was not profit.

We think the absence of a primary motive or intent to earn profits is further evidenced by the fact that the petitioner advanced substantial amounts late in the 2 seasons before us. She advanced approximately $128,000 and $62,000 from April to September of the years 1942 and 1943, respectively. To recover these amounts, much less earn a return on them, it would have been necessary to overcome a second limitation in addition to the limitation of sharing in only one-half of the "operating profits" as explained previously. That is, it would have been necessary for The Ballet Theatre, Inc., to earn profits sufficient to absorb the then current losses, which must have been considerable judging from the fact that the losses for the seasons totaled approximately $205,000 and $183,000, respectively. Moreover, these profits would have had to be earned late in a season that as of the date of the late advances had proved to be a financial failure.

In reaching the conclusion that the petitioner's primary motive or intent in advancing the sums was not the earning of profit, we have kept in mind the fact that circumstances which would lead a reasonable business man to conclude that a theatrical enterprise of this character had no reasonable chance of success might not have that effect on an enthusiast of the ballet, and in this proceeding we are not testing the petitioner's motive or intent by asking what a reasonable man would have done. But even when the transaction is viewed from the petitioner's standpoint, we think the record at best merely establishes that she hoped for a profit. After a most painstaking study of the entire record, we have reached the conclusion that the petitioner was

---

[9] During the years in question, the petitioner held beneficially 51 shares of The Ballet Theatre, Inc.; her wholly owned corporation held 237½ to 250 shares, and 250 additional shares were due from the corporation because of the sale of properties to it. There were outstanding during these years 341 shares of the capital stock of The Ballet Theatre, Inc.

not primarily concerned with the earning of a profit on her advances but, rather, with the success of the ballet as an art. We, therefore, conclude that the petitioner may not deduct the sums in question under section 23 (e) (2) as a loss incurred in a transaction entered into for profit. *Morton* v. *Commissioner, supra; Thacher* v. *Lowe, supra; Lihme* v. *Anderson, supra; Coffey* v. *Commissioner, supra; John Randolph Hopkins, supra; Frederick H. Wood, supra; Early* v. *Atkinson, supra; Helvering* v. *National Grocery Co., supra; Weir* v. *Commissioner, supra.*

*Decision will be entered under Rule 50.*