Lucia Chase Ewing v. Commissioner.
Ewing v. Commissioner
Docket Nos. 40943, 54050.
United States Tax Court
T.C. Memo 1956-205; 1956 Tax Ct. Memo LEXIS 90; 15 T.C.M. (CCH) 1060; T.C.M. (RIA) 56205; August 31, 1956
Adrian W. DeWind, Esq., 575 Madison Avenue, New York, N. Y., and Richard H. Paul, Esq., for the petitioner. John J. Madden, Esq., and Richard G. Maloney, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings involve deficiencies in income taxes determined as follows: Calendar Year
Amount
1944
$61,096.32
1945
46,187.63
1946
54,076.17
1947
65,559.14
1948
61,785.93
1949
9,186.24 Concessions by respondent with respect to exclusions from net income as set forth in the notice of deficiency for the calendar years 1944 through 1948 may be taken into account in a computation under Rule 50. Petitioner, *91 in addition to contesting the deficiencies, claims overpayments of income taxes with respect to the years involved. The principal issue presented is whether unrecovered advances to a corporation, and contributions to a partnership, made by petitioner are deductible under section 23 (e)(2) of the Internal Revenue Code of 1939 as losses incurred in transactions entered into for profit. Findings of Fact Some of the facts have been stipulated and are hereby found. Petitioner, a resident of New York, New York, filed her income tax returns for the taxable years 1944 through 1949 on a calendar year and cash basis with the collector of internal revenue for the third district of New York. Mikhail Mordkin, a Russian ballet dancer and choreographer, was presenting ballets in New York during the 1920's and early 1930's. By 1937 petitioner was a principal dancer in the Mordkin ballet. In the fall of 1937 Mordkin and Rudolph Orthwine, a New York businessman, arranged to take the Mordkin ballet on tour in the eastern United States and Canada. Petitioner advanced monies in connection with this project. These three individuals formed the Advanced Arts Ballets, Inc., in December 1937 to take *92 over the production of ballets. Petitioner originally purchased 51 shares of Advanced Arts Ballets, Inc., and in addition made loans to it to finance the 1937-38 and 1938-39 seasons of the Mordkin ballet. The Mordkin ballet was not financially successful, and petitioner claimed bad debt deductions with respect to these loans, the deductibility of which in the year 1939 was upheld by the Tax Court in Lucia Chase Ewing, T.C. Memo. Op., Oct. 4, 1946, Docket No. 7077 [5 TCM 908]. In the summer of 1939 Richard Pleasant approached petitioner with a proposal to form an American ballet company, the idea of which was to appeal to the large American public interested in theatrical entertainment, attracted to a ballet company more American in spirit than the purely classical foreign companies appealing to the existing ballet audience. Pleasant proposed to present popular classical ballets, and also new creations, done by the best choreographers, that would appeal to a wider public, instead of relying on the works of just one chore-grapher, as prior ballet companies had done. He invited eleven choreographers, some tested and popular, others creative new choreographers, to present *93 their best works. He also wanted a combination of ballet and theater entertainment, and hence the dance company was to be named the Ballet Theatre. Petitioner and Pleasant agreed that the company would have to be done on a large scale to attract successfully the American public. Petitioner regarded the venture, like all theatrical attractions, as speculative. By 1939 petitioner was the sole stockholder of Advanced Arts Ballets, Inc., and through that corporation formed the Ballet Theatre. Pleasant was completely in charge, as producer and managing director. The first engagement opened at the Center Theatre in New York on January 11, 1940 and played for 4 weeks. The company was artistically successful, with the box office increasing each week, but was financially unsuccessful; it was not possible to extend its New York run or go on tour without a large additional investment, and it did not play long enough to earn back the original investment in ballets. Petitioner financed the Ballet Theatre in the 1939-40 season through loans which she made to Advanced Arts Ballets, Inc., for which she claimed a bad debt deduction for 1940, the deductibility of which was also upheld by the Tax Court *94 in the previously-cited proceeding. On April 18, 1940 The Ballet Theatre, Inc., [1] a New York corporation, was organized, and in September 1940 it purchased the ballet properties from Advanced Arts Ballets, Inc., for $100,000, payment to consist of 500 shares of The Ballet Theatre, Inc., stock, of which 250 shares were issued on October 14, 1940. Throughout the years under review, petitioner was the beneficial owner of a minimum of 61 and a maximum of 63 shares of The Ballet Theatre, Inc., and, through her ownership of all of the stock of Advanced Arts Ballets, Inc., was the indirect owner, in addition, of 237 1/2 shares of The Ballet Theatre, Inc. The number of shares beneficially owned by others during this period was 42 1/2, so that petitioner at all times, directly or indirectly, owned in excess of 87 per cent of the stock of The Ballet Theatre, Inc. Petitioner was also a member of the board of directors of The Ballet Theatre, Inc., from April 21, 1941 throughout the years under review. *95 The Ballet Theatre, Inc., presented a performance at the Lewisohn Stadium and at Robin Hood Dell in June 1940 and secured a contract to play at the Chicago Opera in October 1940. Thereafter, petitioner and others organized Ballet Presentations, Inc., which presented Ballet Theatre in the Majestic Theatre in New York in 1941. The show closed after 1 month because it was proving financially unprofitable. No more performances were presented in the spring of 1941 and Ballet Presentations, Inc., was dissolved late in 1941. In 1941 petitioner lent $62,500 to Ballet Presentations, Inc. She deducted this amount on her tax return for 1941 as a bad debt, the deductibility of which was upheld after trial before jury in the United States District Court for the Southern District of New York in Ewing v. Higgins, (S.D., N.Y., June 18, 1952) 44 A.F.T.R. 1057, unreported officially. After the Majestic Theatre engagement, Pleasant was dismissed as managing director of The Ballet Theatre, Inc., at the instance of petitioner because he had been unable to make a financial success of the season, although petitioner was completely satisfied with its artistic success and the Ballet Theatre *96 still follows his basic idea. In 1941 German Sevastianov, formerly the managing director of the Ballet Russe de Monte Carlo, was engaged as managing director. On June 19, 1941, The Ballet Theatre, Inc., entered into a contract with Hurok Attractions, Inc., which provided in part that: Hurok Attractions, Inc., as "manager," engaged Ballet Theatre under its exclusive management for 2 years commencing on or about November 1, 1941 for tours in the United States, Canada, Mexico and Cuba; the manager guaranteed a fixed number of performing weeks for each year, and agreed to pay The Ballet Theatre, Inc., a fixed amount performing week plus 50 per cent of the manager's weekly gross receipts in excess of an agreed amount (plus bona fide booking charges paid by the manager), except for performances in New York City with respect to which The Ballet Theatre, Inc., had no right to share in the manager's weekly gross receipts; the manager had the right to make up in future weeks amounts by which weekly receipts fell below an agreed amount and was given options to extend the contract for 3 ensuing years under similar arrangements; the manager was required to pay transportation on tour, to provide *97 on orchestra, publicity and advertising and provide the theaters and stagehands; and The Ballet Theatre, Inc., was required to maintain the dance company and present four new ballets each year. Both Sevastianov and petitioner considered the contract favorable to The Ballet Theatre, Inc., petitioner because it provided for guaranteed amounts of money, which she understood were sufficient to cover the responsibilities Ballet Theatre would assume, and it provided an opportunity to share in profits, which she felt would cover the costs of new productions. Hurok, the one person who booked ballet in this country, for similar reasons, believed that under this contract Ballet Theatre would be able to make a profit even though it did not participate in box office proceeds in New York City. Petitioner financed the production of ballet for the 1941-42 season by advances to High Time Promotions, Inc., a New York corporation organized in October 1941 and beneficially owned solely by her. Advances were made under a loan agreement between petitioner and High Promotions, Inc., and in turn High Time Promotions, Inc., made advances to The Ballet Theatre, Inc., under a loan agreement which stated *98 that High Time Promotions, Inc., would be repaid out of 50 per cent of operating profits. During the 1941-42 season Ballet Theatre toured the United States and presented performances in New York City under the Hurok contract. The Ballet Theatre, Inc., operated at a loss of $205,035.05 during that season and petitioner on her tax return for 1942 deducted, as a bad debt, $203,789.81 of the $243,500 advanced by her to The Ballet Theatre, Inc., through High Time Promotions, Inc. Respondent's disallowance of this deduction was upheld by the Tax Court, 20 T.C. 216, affd. (C.A. 2) 213 Fed. (2d) 438. Petitioner attributed the financial failure of the 1941-42 season to Ballet Theatre being not yet well enough known on the road. She continued to finance it for the 1942-43 season because she felt that after the first season there would be an increase in the box office on the road tour and because in the spring of 1942 the Hurok contract had been renegotiated and a modification of the original agreement had been entered into on June 26, 1942 with improvements in the position of The Ballet Theatre, Inc. During the 1942-43 season Ballet Theatre toured the United States *99 and presented performances in New York City under the Hurok contract as amended by the supplemental agreement. During this season petitioner advanced $172,500 to The Ballet Theatre, Inc., under an agreement similar to the one of the preceding season and on her 1943 tax return claimed a deduction of $140,630.22. Respondent's disallowance of this deduction was also upheld in 20 T.C. 216, supra. The balance of these advances made by petitioner was carried on the books of The Ballet Theatre, Inc., as a credit to the account of petitioner and considered as an advance for the 1943-44 ballet season. Petitioner ascribed the financial failure of the 1942-43 season to unanticipated rising costs of productions and to unanticipated costs of preliminary rehearsal weeks and keeping productions in order. She objected to The Ballet Theatre, Inc., not sharing in the New York receipts under the Hurok contract and the billing of Ballet Theatre as "the greatest in Russian Ballet," with an increasing emphasis on the Russian ballet, which she felt was not directed to the American public which she wanted to attract. At the end of the 1942-43 season she hoped that there could be additional *100 negotiations of the Hurok contract and was looking to the time when either The Ballet Theatre, Inc., could share in New York receipts or be rid of the contract. She regarded The Ballet Theatre, Inc., as a valuable corporation in connection with a performing company and a substantial repertoire, its value being much greater as a going concern than its assets would realize in liquidation. She did not regard three seasons as an excessive time for developing a company which she expected to go on for years. In the spring of 1943 Sevastianov was drafted into the Military Service. He was replaced by Alden Talbot, a member of the board of directors and later, on December 15, 1943, president of The Ballet Theatre, Inc. When Talbot succeeded Sevastianov, arrangements for the 1943-44 season had already been started, and he told petitioner he anticipated losses for that season, but that he felt that the losses might be eliminated in the following year and he hoped that he could renegotiate the Hurok contract. On November 4, 1943 petitioner executed and had filed a Certificate of Doing Business under the name Hillbright Theatrical Enterprises and after December 31, 1943 all sums advanced by *101 her to The Ballet Theatre, Inc., were advanced through Hillbright Theatrical Enterprises. In addition, petitioner, under the name Hillbright Theatrical Enterprises, made investments in other theatrical attractions. Petitioner, herself or through Hillbright Theatrical Enterprises, made periodic advances aggregating $157,500 during the 1943-44 season. These advances were not made pursuant to any written agreement, but were made pursuant to an oral agreement. Petitioner understood the oral agreement to be typical of a Broadway investment agreement. For all years under review, a New York accounting firm specializing in theatrical accounting prepared Ballet Theatre's fiancial reports; for 1948 and 1949 it prepared petitioner's Federal income tax returns. During the 1943-44 season petitioner first began to take an active part in the business management of The Ballet Theatre, Inc., helping Talbot, especially with respect to contracts with dancers, and familiarizing herself with the ballet business. In December 1943 petitioner became a member of the executive committee of the board of directors of The Ballet Theatre, Inc., and was kept informed of the conditions of the business. During *102 that season Ballet Theatre toured the United States and presented performances in New York City under the Hurok contract. The gross box office receipts for the season, excluding the summer tour, were $872,622. After deduction of payments to local managers, Hurok Attractions, Inc., received gross receipts of $754,023; The Ballet Theatre, Inc., received $178,860. The loss of The Ballet Theatre, Inc., for the season was $162,742.96, of which $92,723.36 represented production costs. Of the $189,469.78 credited to the accounts of petitioner and Hillbright Theatrical Enterprises for that season, $159,367.96 was used for the season and was eliminated from the accounts at the end of the season. The balance of the losses for that season, $3,375, was applied to extinguish the account of The Ballet Theatre, Inc., to New York Ballet Associates, Inc., a New York corporation neither affiliated with The Ballet Theatre, Inc., nor owned or controlled by petitioner. The balance of the advances of petitioner and Hillbright Theatrical Enterprises, $30,101.82, was considered as an advance by Hillbright Theatrical Enterprises for the 1944-45 ballet season. On her tax return for 1944 petitioner claimed *103 a deduction of $165,892.56 as a loss from business or profession under the name Hillbright Theatrical Enterprises, of which $159,367.96 reflected advances to The Ballet Theatre, Inc., $5,240.50 reflected losses incurred in two other theatrical ventures, $14.90 reflected gains from another theatrical venture, and $1,300 reflected office rent and expense. [2]
In the spring of 1944 the Hurok contract was renegotiated and on April 28, 1944 it was modified by a second supplemental agreement which provided: that the basic weekly guarantee was increased from $4,800 to $6,000 for performances outside New York and was increased to $7,000 for New York performances, with the profit-sharing point increased from $14,500 to $15,700 and the deficit point increased from $13,050 to 14,250; that the number of guaranteed weeks for the 1944-45 and 1945-46 seasons was increased from 20 to 25; that adjustments would be made in basic guarantees to reflect increases or decreases in the aggregate weekly salaries of 16 soloists; that the number of new ballets which The Ballet Theatre, Inc., was required to present each *104 season was decreased from four to two, with an aggregate production cost not to exceed $25,000; and that Hurok was given an additional option for the 1946-47 season. Petitioner continued to finance The Ballet Theatre, Inc., for the 1944-45 season. She felt that she should not fail to fulfill the Hurok contract and she was encouraged by its renegotiation. At the beginning of this season, as a result of estimates made by the executive secretary of The Ballet Theatre, Inc., Talbot told petitioner that he was afraid there might be a $50,000 loss for the season. Petitioner, through Hillbright Theatrical Enterprises, made periodic advances to The Ballet Theatre, Inc., aggregating $72,250 for the 1944-45 season, pursuant to an oral agreement. During that season Ballet Theatre toured the United States and presented performances in New York City under the Hurok contract. The actual gross box office receipts for the season, excluding box office receipts for the summer tour, were $943,432. After deduction of payments to local managers, Hurok Attractions, Inc., received gross receipts of $739,540, The Ballet Theatre, Inc., received $186,393. The loss of The Ballet Theatre, Inc., for the season *105 was $73,620.05, of which $24,737.66 represented production costs. Of the $105,351.82 credited to the account of Hillbright Theatrical Enterprises for the season, $73,620.05 was used by The Ballet Theatre, Inc., for that season and eliminated from the Hillbright Theatrical Enterprises account on the books of The Ballet Theatre, Inc., and credited to profit and loss. The remainder, $31,731.77, was considered as an advance for the 1945-46 season. On her tax return for 1945 petitioner claimed a deduction of $72,475.57 as a loss from business or profession under the name Hillbright Theatrical Enterprises, of which $73,620.05 reflected advances made to The Ballet Theatre, Inc., $1,441.48 reflected losses incurred in two other theatrical ventures, $3,855.78 reflected gains from three other theatrical ventures, and $1,269.82 reflected office expense. Petitioner became vice president of The Ballet Theatre, Inc., on January 3, 1945. Talbot resigned as president and managing director in the spring of 1945, and petitioner became president on April 23, 1945 and, when a suitable managing director could not be found, she became co-director of the dance company with Oliver Smith, theatrical producer *106 and stage designer. At the beginning of the 1945-46 season petitioner hoped that Ballet Theatre was a million-dollar box office attraction which was increasing each year. She did not want to give up and lose everything. Though she was looking forward to the end of the Hurok contract when she felt that the venture might do better, she thought it not impossible to do better even under the Hurok contract. In every renegotiation of the Hurok contract, Hurok was asked, but refused, to extend the profit-sharing agreement to New York. Petitioner, through Hillbright Theatrical Enterprises, made periodic advances to The Ballet Theatre, Inc., aggregating $206,000 for the 1945-46 season. During that season Ballet Theatre toured the United States and presented performances in New York City under the Hurok contract. From July 4, 1946 to August 31, 1946 Ballet Theatre also gave ballet performances at the Royal Opera House, Covent Garden, London, England, for a guarantee of $8,000 per week plus transportation costs. The actual box office receipts for the season, excluding the Covent Garden engagement, were $961,801. After deduction of payments to local managers, Hurok Attractions, Inc., received *107 gross receipts of $753,579, The Ballet Theatre, Inc., received $202,427. In addition, box office receipts at Covent Garden were $197,672, so that the aggregate box office receipts for the season were $1,159,473. The loss of The Ballet Theatre, Inc., for the season was $193,693.35, of which $59,609.75 represented production costs. Of the $237,731.77 credited to the account of Hillbright Theatrical Enterprises for the season, $193,693.35 was used by The Ballet Theatre, Inc., for the season and eliminated from the account of Hillbright Theatrical Enterprises on the books of The Ballet Theatre, Inc., and credited to profit and loss. The remainder, $44,038.42, was considered as an advance for the 1946-47 ballet season. On her tax return for 1946 petitioner claimed a deduction of $200,909.61 as a loss from business or profession under the name Hillbright Theatrical Enterprises, of which $193,693.35 reflected advances made to The Ballet Theatre, Inc., $11,892.36 reflected losses incurred in six other theatrical ventures, $5,452.96 reflected gains from four other theatrical ventures, and $776.86 represented office expense. Petitioner was anxious to terminate the Hurok contract at the end *108 of the 1945-46 season. She had always wanted Ballet Theatre to share in the Metropolitan Opera box office receipts, which she felt were very profitable for Hurok, and Hurok had always refused this. Hurok understood that Ballet Theatre wanted to go on its own in order to obtain for itself the profit he had made in all seasons except his first season. By an agreement dated April 20, 1946, The Ballet Theatre, Inc., and Hurok Attractions, Inc., settled their disputes, including a legal action commenced by the former. The settlement included the termination of the Hurok contract and the payment of $12,500 and assignment of one ballet to Hurok Attractions, Inc. After the termination of the Hurok contract, The Ballet Theatre, Inc., entered into an agreement with MCA Concerts, Ltd., a booking organization which petitioner understood was the strongest organization to compete against Hurok. Under this booking agreement, dated May 24, 1946, The Ballet Theatre, Inc., employed MCA as its exclusive representative to negotiate all contracts for the performance of its ballet productions in all the United States, except New York City, for a term from May 24, 1946 to May 31, 1948, unless sooner terminated *109 as therein provided, for booking fees ranging from 5 to 10 per cent of gross contract prices. On May 21, 1946, the executive secretary of The Ballet Theatre, Inc., as one of her regular duties, prepared an estimate of costs for the 1946-47 season. The estimate differed from estimates made in prior seasons in that it included disbursements which in prior seasons had been handled by Hurok Attractions, Inc., such as orchestra expenses, transportation of the company and scenery, publicity, press agents, some of the stagehands, carpenters, etc. The total season cost, thus estimated and without provision for booking fees which were as yet undetermined, based on 30 performing weeks was $563,696.50, excluding New York office and general overhead expenses of $44,360, or a total of $608,056.50. This total did not include estimated production costs, since petitioner thought that for her first season she would do without new productions, if possible. Petitioner hoped that on the basis of this estimate of costs and expenses and a box office gross equal to that of the preceding season something might be left even after deduction of the 30 per cent local manager's share and booking fees under the *110 MCA contract. On July 1, 1946 The Ballet Theatre 1946-7 Company, a limited partnership, was organized by petitioner, as general partner. Petitioner formed the limited partnership upon advice of her lawyer and because she felt that the time had come, with over a million dollars in box office receipts for the prior season, when certain investors could be interested in the company. The limited partners were Sherman Ewing ($1,000 investment), Lousine P. Tcherepnine ($6,000 investment), Dwight Deere Wiman ($30,000 investment), Henry Clifford ($2,000 investment), Theatre Guild, Inc. ($2,500 investment), and petitioner. Wiman was a producer of Broadway shows and member of the board of directors of The Ballet Theatre, Inc., since September 1946. Petitioner understood this limited partnership agreement to be typical of contracts by which investors invest in Broadway productions. It provided: that the partnership would execute an agreement with The Ballet Theatre, Inc., providing for the presentation of the 1946-47 season of the dance company by the partnership in exchange for payment to The Ballet Theatre, Inc., of a cash office charge of $850 per week and 40 per cent of the operating profits; *111 that 84 per cent of the profits after payment to The Ballet Theatre, Inc., of its share, or approximately 50 per cent of total profits, would be paid to the limited partners, and 16 per cent of the profits after payment to The Ballet Theatre, Inc., of its share, or approximately 10 per cent of total profits, would be paid to petitioner as general partner; and that on termination of the partnership, proceeds of liquidation were to be distributed first to pay all debts, obligations and taxes, second, to pay to The Ballet Theatre, Inc., its share of profits, if any, third, to repay limited partnership contributions, and finally, to pay any surplus to all partners in the proportion in which they share profits. During the 1946-47 season Ballet Theatre toured the United States and presented performances in New York City, and also in Cuba. The partnership was unable to present its New York City performances at the Metropolitan Opera House because Hurok rented the Metropolitan and presented another ballet company there, making it necessary for the Ballet Theatre to present its New York City performances at the Broadway Theatre in the fall and the New York City Center in the spring in competition *112 with Hurok. The actual box office receipts for the season, exclusive of the Cuba engagement, were $536,126. The Ballet Theatre 1946-7 Company's share of gross receipts was $327,526, plus $11,206 from the Cuba engagement. Petitioner, through Hillbright Theatrical Enterprises, made periodic contributions aggregating $413,500 to The Ballet Theatre 1946-7 Company during the 1946-47 season. The losses of The Ballet Theatre 1946-7 Company for the season were $431,954.99. Of this amount, $41,500 was borne by limited partners other than petitioner, and petitioner incurred losses of $390,454.99. The balance of the aggregate investment of $455,000 in The Ballet Theatre 1946-7 Company, $23,045.01, was represented on the books of the partnership as an amount due from The Ballet Theatre, Inc. As of May 31, 1948, this amount was considered as an advance by Hillbright Theatrical Enterprises to The Ballet Theatre, Inc., for the 1947-48 season. Although Ballet Theatre's expenses exceeded estimates, principally on items which had been handled by Hurok in prior seasons, it also suffered a substantial decline in box office, from approximately $1,159,000 to approximately $540,000. On her tax return *113 for 1947 petitioner claimed a deduction of $392,282 as a loss from business or profession under the name Hillbright Theatrical Enterprises, of which $390,454.99 reflected contributions made to The Ballet Theatre 1946-7 Company, $1,142.26 reflected a loss in another theatrical venture, and $684.75 reflected office expense. For the 1946-47 ballet season the books of The Ballet Theatre, Inc., showed profits of $2,549.77, of which 50 per cent, or $1,274.88, was credited to the account of Hillbright Theatrical Enterprises. The loans payable account of The Ballet Theatre, Inc., to Hillbright Theatrical Enterprises was $44,038.42 as of September 1, 1946, and was increased by $1,274.88 to $45,313.30 as of August 31, 1947. For the 1947-48 season Hurok offered The Ballet Theatre, Inc., a booking at the Metropolitan Opera House, turned over some of his other bookings and had no competing company. The booking agreement with MCA, which had turned out badly, was terminated and The Ballet Theatre, Inc., on September 1, 1947, entered into a new booking agreement with its publicity man who had prior successful booking experience. The Ballet Theatre, Inc., had a booking contract for $98,000 for *114 4 weeks' performances in Bogota, Colombia, South America. Petitioner felt that with these bookings it would be possible to restore the company to its 1945-6 level of box office receipts and realize a profit in the 1947-48 season. During the 1947-48 season Ballet Theatre was presented by The Ballet Theatre, Inc. It toured the United States and presented performances at the New York City Center in the fall and at the Metropolitan Opera House in the spring. Its South American engagement was canceled on account of a revolution, resulting in a $49,000 payment to The Ballet Theatre, Inc., on account of the $98,000 guarantee. The total box office receipts for the season were $611,035; after deduction of payments to local managers, The Ballet Theatre, Inc., received $416,595 of the gross receipts. Petitioner, through Hillbright Theatrical Enterprises, made periodic advances to The Ballet Theatre, Inc., aggregating $310,545.01 for the 1947-48 season, under an agreement dated as of September 1, 1947 between The Ballet Theatre, Inc., and Hillbright Theatrical Enterprises. Petitioner understood the terms of this agreement, which were similar to the terms of the agreements with respect to advances *115 for the 1941-42 and 1942-43 seasons, to be the same as the terms of the 1943-44 and subsequent oral agreements and The Ballet Theatre 1946-7 Company agreement, and the same as terms generally standard for Broadway theatrical financing. The loss of The Ballet Theatre, Inc., for the season was $341,573.78, of which $84,982.77 represented net production costs. Of the $355,858.31 credited to the account of Hillbright Theatrical Enterprises for the season, $341,573.78 was used by The Ballet Theatre, Inc., for the season and was eliminated from the account and credited to profit and loss. The remainder, $14,284.53, was considered as an advance for the 1948-49 season. On her tax return for 1948 petitioner claimed a deduction of $340,419.95 as a loss from business or profession under the name Hillbright Theatrical Enterprises, of which $341,573.78 reflected advances made to The Ballet Theatre, Inc., $57.74 reflected losses incurred in another threatrical venture, $1,372.21 reflected gains from three other threatrical ventures, and $160.64 reflected office expense. After petitioner's losses from the first presentation of the Ballet Theatre in 1940 through the 1947-48 season, which represented *116 a sizable portion of her resources, petitioner was not willing to go ahead with bookings for the 1948-49 season. She still had faith in her original idea of a successful American ballet company. Petitioner consulted with Dwight Deere Wiman to see if it wasn't possible to keep the idea of Ballet Theatre from being abandoned and was advised and urged by him to finance a short spring season to keep the name of the company going and to keep the dancers together. Petitioner also took steps to eliminate the cost of productions of the company. The Ballet Theatre Foundation, Inc., was formed, a tax-exempt educational institution which, through the contributions it received, provided money for producing new creative ballets. Petitioner was taking steps to preserve the Ballet Theatre, but was not willing to operate it as previously. Petitioner made no new advances for the 1948-49 season. In the early part of 1949 Ballet Theatre briefly toured the eastern part of the United States and presented performances in the Metropolitan Opera House in New York City. The loss of The Ballet Theatre, Inc., for the 1948-49 ballet season was $109,263.38. All of the $14,284.53 credited to the account of *117 Hillbright Theatrical Enterprises at the beginning of the season as an advance from the prior season was used by The Ballet Theatre, Inc., in the course of the season and eliminated from the account of Hillbright Theatrical Enterprises on the books of The Ballet Theatre, Inc.; the production costs, previously written off, of one ballet in the amount of $24,812.62 were transferred to Ballet Theatre Foundation, Inc., in payment on account of loans; and the balance of the net loss for the year, $70,166.23, was added to the deficit existing at the close of the previous season. On her tax return for 1949 petitioner claimed a deduction of $14,596.79 as loss from business or profession under the name Hillbright Theatrical Enterprises, of which $14,284.53 reflected the balance of petitioner's advances to The Ballet Theatre, Inc., $372.06 reflected losses incurred in two other theatrical ventures, and $59.80 reflected gains from two other theatrical ventures. During all the years in controversy The Ballet Theatre, Inc., showed on its financial statements, classified as a general loan, an indebtedness to petitioner of $98,003.57. Petitioner's intent and motive in making advances to The *118 Ballet Theatre, Inc., and contributions to The Ballet Theatre 1946-7 Company was to aid in the production of ballet as an art in America. Her intent and motive was not to any substantial extent the earning of profits for herself, and the transactions she entered into in making the advances were not transactions entered into for profit. Opinion As in the prior proceeding, Lucia Chase Ewing, 20 T.C. 216, 228, affd. (C.A. 2) 213 Fed. (2d) 438, "The basic question before us is the deductibility of unrecovered sums advanced by the petitioner to * * * her controlled corporation, for the production of ballet." In one year advances were made to a partnership of which petitioner was the general partner. And there is no issue here as there was in 20 T.C. 216, supra, of the deductibility of a bad debt. Nevertheless, here as there, "The petitioner contends that the sums advanced * * * represented her contributions * * * for the production of ballet and their loss is deductible under section 23(e)(2) as a loss incurred in a transaction entered into for profit. The respondent * * * contends the petitioner's primary motive or intent in advancing the funds *119 was not profit." In the previous case we said (at pages 232, 233, 234): "Finally, we come to the requirement relating to the petitioner's motive or intent in making the cash advances, a requirement basic to the allowance of a loss deduction under section 23(e)(2) regardless of whether the petitioner contends the losses were incurred in a joint venture or in any other relationship. "Section 23(e)(2) allows the deduction of losses only if they are incurred in a 'transaction entered into for profit.' That is, no loss is deductible under this provision if the taxpayer engaged in the transaction merely or primarily for pleasure such as farming for a hobby, or primarily for such other purposes devoid of profit motive or intent, such as promoting charitable enterprises or obtaining the benefits of financial security by the purchase of an annuity. [citing cases] Not only must the earning of profit be the taxpayer's motive or intent but, in addition, that motive must be the primary purpose for engaging in the transaction and it is not sufficient if it is merely incidental or subordinate to other purposes. [citing cases] In short, the profit motive must be the 'prime thing.' * * * *120 "The respondent contends the petitioner did not advance the sums primarily for the purpose of earning a profit in the production of ballet but for the primary purpose of satisfying her desire to see the ballet flourish in some form as an art in America. After carefully studying all the evidence and giving due weight to the testimony of the petitioner, as well as the contracts pursuant to which she advanced the sums, we have concluded that during the years in question the petitioner did not finance the production of ballet primarily for the purpose of earning a profit. "For many years the petitioner has been a principal dancer in the Ballet Theatre dance company. She is devoted to the art of ballet and anxious to develop that art in America. Commencing in 1937, she advanced large sums of cash for the production and presentation of ballet performances. "Beginning with her first advances in 1937, the petitioner has suffered continuous losses. Since that time, up to and including the 1941-1942 and 1942-1943 ballet seasons before us in this proceeding, the ballet company or companies in which she has been financially, artistically, and professionally interested have been financial *121 failures. Never at any time had they even nearly achieved financial success or at least indicated a pattern of decreasing losses. Each year substantial losses were suffered and there was not, by the time the advances in question were made, anything but highly speculative reasons for concluding that financial failures would not occur again as they in fact did. Nonetheless the petitioner advanced sums as high as $50,000 at a time during the seasons in question and there is no evidence that she ever refused to make advances when asked to do so or that she advanced any substantial sum for the promtion of any other theatrical enterprise. As stated by the Circuit Court of Appeals for the Second Circuit, in Morton v. Commissioner, supra, p. 304: 'It is true that a record of continual losses over a series of years does not in itself preclude the allowance of such losses as a business expense. The intent of the taxpayer in making his expenditures is what counts; but the continuing lack of profits is an important factor bearing on the taxpayer's true intention.' Cf. Thacher v. Lowe, supra. "Despite the continued losses, the petitioner apparently gave little or no attention to the business *122 management of The Ballet Theatre, Inc., and we cannot find sufficient indication that she made the inquiries which would have been made as a matter of course if her primary interest was financial gain. She seems to have made advances as the needs of The Ballet Theatre, Inc., developed and almost entirely at the request of the corporation's business managers. Some of the advances were made at a time during the financially unsuccessful seasons when the performances were about to be discontinued because of the lack of funds. "We think the terms of the agreements under which the petitioner advanced these funds to her controlled corporation, The Ballet Theatre, Inc., is further evidence bearing on her primary motive or intent. The advances were to be repaid only out of one-half of 'operating profits' for the particular season, and to the extent that these profits were insufficient for that purpose, the petitioner lost all right to recovery. The Ballet Theatre, Inc., was absolved of all liability to make repayment even though it might earn a substantial profit in subsequent seasons. "Moreover, as previously explained, the 'operating profits' upon which the petitioner's recovery as well *123 as gain depended were computed by deducting from gross receipts not only expenses, referred to as preliminary, running, and other expenses, but also the cost of ballet properties which became the sole property of The Ballet Theatre, Inc., and could be used for more than 1 season. The effect of this arrangement was that part of the sums which the petitioner seeks to deduct for income tax purposes represents expenditures for assets that became the property of petitioner's controlled corporation. These expenditures totaled approximately $78,000 for the 1941-1942 season and approximately $64,000 for the 1942-1943 season." Although some of the details were changed in the subsequent years the pattern was essentially the same. A few of the comments made do not apply to all of the period now in controversy. Petitioner did apparently finance other theatrical ventures although the net result was a loss, the amounts involved must have been negligible compared to what she contributed to the ballet, and we have no more knowledge of any profit motive there than we have here. Petitioner did apparently through force of circumstances become increasingly involved in the business management of the *124 ballet company and perhaps in these years became better acquainted with the financial verities. There was even one season in which she succeeded in including others to make financial contributions where otherwise she was uniformly the sole supporter of the project. And some of the contracts were apparently slightly more favorable to her in that she was perhaps entitled to recover her advances before a part of the profits would be plowed back. [3] Needless to say this was largely academic since there were virtually no profits. [4]
But against these minor variations in the arrangements from year to year the unfavorable aspects are that by 1949 petitioner *125 had continued in the same general activity for 12 years with no improvement in the ultimate financial result of each year. By that time the history of her losses, advances and contributions to the various ballet projects was as follows, the last 6 years being those as to which petitioner seeks the deductions now in controversy: Amount of
Loss Claimed
Advance or
by Petitioner
Year
Contribution
Per Return
1938
$141,900.00
1939
116,200.00
$ 58,100.00
1940
141,500.00
241,500.00
1941
62,500.00
62,500.00
1942
245,000.00
203,789.81
1943
172,500.00
140,630.22
1944
157,500.00
159,367.96
1945
75,250.00
73,620.05
1946
206,000.00
193,693.35
1947
413,500.00
390,454.99
1948
310,545.01
341,573.78
1949
14,284.53(Carry-
14,284.53
over from pre-
vious year.) Such a record combined with the other circumstances makes it impossible to conclude that financial reward had any part in the objective to which these large sums were devoted from year to year. Petitioner, to be sure, made a number of changes from time to time in the organization, form, management and general arrangements for the ballet company. Some were forced upon her, but *126 some undoubtedly proceeded from a desire to improve the financial condition of affairs. No doubt she was interested in breaking even or at least losing less money if that proved feasible. "* * * she could not afford to suffer losses of capital indefinitely." But the desire to make a profit as distinguished from a single-minded interest in ballet as a form of popularly-patronized art does not appear. As we said at 20 T.C. 235: "In reaching the conclusion that the petitioner's primary motive or intent in advancing the sums was not the earning of profit, we have kept in mind the fact that circumstances which would lead a reasonable business man to conclude that a theatrical enterprise of this character had no reasonable chance of success might not have that effect on an enthusiast of the ballet, and in this proceeding we are not testing the petitioner's motive or intent by asking what a reasonable man would have done. But even when the transaction is viewed from the petitioner's standpoint, we think the record at best merely establishes that she hoped for a profit. * * *" Even that hope must have become faint when the continuing losses did not diminish but actually *127 tended to increase. Petitioner's motives were undoubtedly praiseworthy. White v. Commissioner, (C.A. 6) 227 Fed. (2d) 779, affirming per curiam 23 T.C. 90, certiorari denied 351 U.S. 939. But on this record we cannot conclude that the making of a profit was among them. As the Court of Appeals said in affirming the prior decision, Ewing v. Commissioner, (C.A. 2) 213 Fed. (2d) 438, 440: "Taxpayer urges that Section 23(e)(2) should permit deductions for losses incurred in commercial ventures and that since the Ballet Theatre, Inc., was run on a commercial basis, the taxpayer is entitled to a deduction. It may be true that Ballet Theatre was run on a commercial basis but we think the crucial question is taxpayer's position in respect to it. In making the loans in question we cannot agree that she was drawn by commercial motives or governed by the desire to make a profit. Moreover, it is [was] clear that the continued existence of Ballet Theatre depended largely on taxpayer's socalled 'loans.' Congress, by taxing gifts and limiting charitable deductions to qualified organizations, did not intend to allow a taxpayer to pour money into *128 an artistic venture to satisfy only a personal desire. Under Section 23(e)(2) a taxpayer can take a deduction only if it is shown that a primary or substantial motive is the desire for profit. Regardless of the artistic appreciation one may have for the ballet or other arts, Congress has not seen fit to permit deductions for contributions made to support them, unless it is clear that the taxpayer had a business purpose in mind." The deficiency is sustained in this respect. To permit other conceded adjustments. Decisions will be entered under Rule 50. Footnotes
1. The dance company formed under the auspices of Advanced Arts Ballets, Inc., was known as "Ballet Theatre." The new corporation formed April 18, 1940 was "The Ballet Theatre, Inc." The dance company continued, under the auspices of the new corporation and later under the partnership formed July 1, 1946, "The Ballet Theatre 1946-7 Company." We shall continue to refer to the dance company as "Ballet Theatre," to the corporation by the full corporate name, "The Ballet Theatre, Inc." and to the partnership by the full partnership name, "The Ballet Theatre 1946-7 Company."↩
2. Total losses are understated $1by due to an error in addition on the tax return.↩
3. Petitioner herself does not regard this as of great significance. She says in her brief: "But, however that may be, it should be noted that since petitioner was at all times the beneficial owner, directly or indirectly, of 87% of the stock of The Ballet Theatre, Inc. (Exh. 3-C), the question of whether profits were made by petitioner personally or by the corporation of which she was the principal owner is of small moment * * *" ↩
4. In 1 year the corporation appears to have made a bookkeeping profit of a comparatively small amount.↩