## WEIR v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7219.

Circuit Court of Appeals, Third Circuit.
Jan. 19, 1940.

Earl F. Reed, John E. Laughlin, Jr., and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Norman D. Keller, and S. Dee Hanson, Sp. Assts. to Atty. Gen. for respondent.

Before MARIS, CLARK, and BIDDLE, Circuit Judges.

CLARK, Circuit Judge.

The first issue at bar concerns the disallowance of a loss deduction from petitioner's net income for the year 1932. The loss asserted is on a transaction involving the purchase and sale of preferred stock in the Bellefield Company, a corporation which owned hotels and apartment houses in Pittsburgh. Petitioner bought the stock in lots at various times in 1925 and 1926, and sold it on December 16, 1932. He repurchased it three and one-half months later, on March 1, 1933. We say "it" because, as it happened, the identical shares were reacquired on repurchase. One Falk, an acquaintance, had held them in the three and one-half months' interval. The Commissioner, not unnaturally, denied the deduction and attacked the good faith of the sale before the Board. But that attack failed utterly. The purchase, sale, and repurchase were made in due course through petitioner's brokers, and in such wise as to establish petitioner's complete ignorance of Falk's connection with the stock. This

assurance was made doubly sure by other undisputed facts. Petitioner was, as he explained, a tenant in an apartment owned by the Bellefield Company. His motive in acquiring the stock was to have a voice in the management in order to "maintain certain standards". He sold the stock because he had decided to move out, the rent, in his opinion, being too high; he repurchased it because he changed his mind and decided to remain inasmuch as the rent had been reduced. The Board, however, stressed the motive for the purchase and held, sua sponte that the transaction was not "entered into for profit" within the meaning of the statute, Revenue Act of 1932, § 23 (e) (2), 47 Stat. 169, 180, 26 U.S.C.A. § 23 (e) (2).

The limitation of deductible losses, outside the sphere of the taxpayer's trade or business, to those incurred in "transactions entered into for profit", first appeared on the statute books as § 5(a) (5th) of the Revenue Act of 1916, 39 Stat. 759. It has been construed ever since in terms of the taxpayer's state of mind, see, Paul, Motive and Intent in Federal Tax Law, Selected Studies in Federal Taxation, Second Series, p. 280. The myriad cases and rulings are collected and discussed in the article above cited, in 3 Paul & Mertens, The Law of Federal Income Taxation § 26.-49, and in 401 C.C.H. para. 195. There are no apt precedents among them. Some are complicated by the rather technical circumstance of a shift in ownership through gift, bequest or devise. Some are concerned with the narrow and often elusive connection between profit and real estate holdings. Others reflect the dreary financial lot of guarantors, or entrepreneurs acting under the suasion of moral obligation. Still others (with, we think, greater pertinence) involve a more sportive segment of the citizenry and their characteristic exploits, such, for example, as the breeding of polo ponies, Farish v. Comm., 36 B.T.A. 1114; Id., 5 Cir., 103 F.2d 63; the maintenance of racing stables, Whitney v. Comm., 3 Cir., 73 F.2d 589; Comm. v. Widener, 3 Cir., 33 F.2d 833; the equipment of expeditions to find the quasi-mythical Central American "white Indian", Du Pont v. Comm., 36 B.T.A. 223; the purchase of cabin cruisers, Lihme v. Anderson, D.C., 18 Supp. 566; the culture of trees, Montgomery v. Comm., 37 B.T.A. 232; or the

pursuit of gentleman farming, Thacher v. Lowe, D.C., 288 F. 994. Generally speaking, the Board and the courts have been liberal in finding the requisite greed. As the author cited above puts it: "The American business man has never appeared so indefatigably optimistic as in some of the cases on this point." [1]

When stock is the subject matter of the transaction, the taxpayer's optimism stands on a much firmer footing. More than twenty years ago a terse Office Decision ruled that the "profit" which must be intended on the purchase of property might relate to income flowing from the tenure of that property, as well as gains realized from its resale, O.D. 138, 1 C.B. 124, and see L.O. 1061, 4 C.B. 160, A.R.R. 604, 5 C.B. 136. This construction is of course an eminently reasonable, indeed necessary, one—otherwise it would be virtually impossible to buy bonds at a premium "for profit"—and it has been consistently followed, see Lewis v. Comm., 34 B.T.A. 996; Tanzer v. Comm., 37 B.T.A. 244; Heiner v. Tindle, 276 U.S. 382, 48 S.Ct. 326, 72 L.Ed. 714. By hypothesis, the purchase of stock carries with it in the form of dividends a share in the earnings and profits of the corporation. Again, by hypothesis, although profits are not always forthcoming, the corporation, at least, is trying to earn them, and generally does. Of course if the corporation cannot earn them, and the taxpayer knows that its stock is worthless, his acquisition of that stock is surely not for profit, Dresser v. United States, Ct.Cl. 55 F.2d 499, certiorari denied 287 U.S. 635, 53 S.Ct. 85, 77 L.Ed. 550. The simpler case is where the corporation is not even trying to earn profits, and the taxpayer has been instrumental in its organization, see Paine v. Comm., 37 B.T.A. 427, affirmed 1 Cir., 102 F.2d 110. So, the intention to purchase stock must from the very nature of the thing purchased include the intention to receive profits (dividends or accretion in value) unless the purchaser knows at the time of purchase that such profits are an impossibility.

Before proceeding further, it is appropriate to notice a timeworn but salient distinction and corresponding difference in terminology. We quote: "* * * 'Intent' may be used in at least three distinct legal meanings. It may designate

---

[1] Paul, Motive and Intent in Federal Tax Law, Selected Studies in Federal Taxation, Second Series, p. 281.

simply the exercise of will power necessary to cause muscular or physical movement. This concept is, of course, irrelevant in the field of tax law. Secondly, it may denote the immediate result desired by the actor. Thirdly, it may signify the ultimate reason for aiming at that immediate objective. At this point, however, intent shades into motive, which is really the *ulterior* intent or the *cause* of the intent. Intent, in other words, is the object of the act; motive, in turn, is the object or spring of the intent. Using the terms in these senses, intent is frequently material to tax questions; whereas motive—properly enough—is of importance only in comparatively rare instances." Paul, Motive and Intent in Federal Tax Law, Selected Studies in Federal Taxation, Second Series, pp. 257, 258.

Petitioner's profit intention must, we think, be taken for granted. His purchase of preferred stock is of course conceded, and that is sufficient to establish prima facie his intent to profit. The deduction has been allowed on similar showings, Tanzer v. Comm., above cited, Lewis v. Comm., above cited, Terry v. United States, D.C., 10 F.Supp. 183, and see T.B.R. 35, 1 C.B. 122, 123. Nothing in the record tends to disprove the intention so established. It is not suggested that petitioner knew, or had any cause to know, that his purchase would be profitless. Furthermore, petitioner's intention and motive of influencing the "standards" of the corporation through his stock ownership presents no repugnancy. One does not exhibit an intention to bid farewell to profits by signing a proxy. This last, it will be noted, serves to distinguish the decisions dealing with non-income producing property. If, for instance, the taxpayer has purchased a yacht, his cruising about in it presupposes a state of mind inconsistent with making a profit out of it by chartering. Hence that inconsistency must be resolved by ascertaining whether the intention or motive of pleasure or that of profit is the "prime thing", Lihme v. Anderson, above cited, and see Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346, footnote 5. In the instant case, on the other hand no such resolution is necessary. We have a profit intention, side by side with a non-profit motive.

We are brought, then, to the final question: Is the requirement "for profit" satisfied by the petitioner's intention or by his motive? The answer, of course, does not lie in the language used. Nor is the legislative history of the statute of any assistance. The similarly worded provision governing the losses of non-residents was debated at some length in the Senate with the result that the words "for profit" were deleted, 53 Cong. Rec. 13263, 13266; Seideman, Legislative History of Federal Income Tax Laws pp. 964 et seq. But the phrase was reinserted by the conference committee, and became law without further discussion, see 53 Cong. Rec. 14110. Nevertheless, the fundamental object of the statute is discernible. As stated by Mr. Justice Stone speaking for an unanimous court: "Section 214[2], read as a whole, discloses plainly a general purpose to permit deductions of capital losses wherever the capital investment is used to produce taxable income." Heiner v. Tindle, 276 U.S. 582, 585, 48 S.Ct. 326, 327, 72 L.Ed. 714. See also, Dresser v. United States, above cited, and excerpts there quoted. In other words, the government says to the taxpayer with shrewd benevolence, "If you intend to benefit us by producing taxable profits, you may take your loss,[3] but if you don't intend to so benefit us, you cannot deduct your losses and we, furthermore will tax you on your windfalls". The benefit of increased revenue is certainly not assured when there is no intention to profit. But the profit intention and the profit motive each assure that benefit with equal force. The public coffers are weighted with the same amount from taxes on Bellefield Company dividends, whether the stock is held with the motive of voting or with the motive of profit. That portion of petitioner's capital was "used to produce taxable income". That being so, petitioner is entitled to his deduction. We need hardly add that a contrary position would only serve to embroil the administrators of the taxing statute in a hectic and ridiculous search for non-profit motives.

---

[2] This section of the Revenue Act of 1918, 40 Stat. 1066, corresponds in all material particulars with § 23 of the Revenue Act of 1932.

[3] The 1916 Act drove a harder but more logical bargain by restricting losses on transactions "entered into for profit" to "an amount not exceeding the profits arising therefrom", Revenue Act of 1916, § 5(a)(5th). The restriction was eliminated by § 214(a)(5) of the Revenue Act of 1918, 40 Stat. 1067.

■ We had recent occasion in Dixon v. Commissioner, 3 Cir., 109 F.2d 984, to discuss the alternative taxability of trust income as between settlor (husband) and beneficiary (his wife who had obtained a divorce under the unique laws of Pennsylvania). The second issue at bar poses the same problem. Indeed, there is but one point of factual difference between the two cases. Here the petitioner declared in his separation agreement: "It is the intention hereof that the party of the second part shall receive eighteen thousand dollars per year during each and every year of her natural life * * *; and the party of the first part guarantees the payment of said annual sum of eighteen thousand dollars to the party of the second part." Record p. 21. In the Dixon case, on the other hand, there was no such promise to pay. The settlor undertook to increase the trust corpus by a limited amount of securities, if the trust income fell below the amount fixed in the trust instrument. For reasons and upon authorities which it is unnecessary to repeat at length or cite we held that the settlor of the Dixon trust could not be taxed upon its income. Among those reasons was the lack of a promise to pay by way of guaranty. Conversely we think, the presence of such a promise affords the sole, yet a valid, ground for taxing the income of the instant trust to the petitioner.

By way of illustration we refer again to one of the authorities quoted in the Dixon case:

"But although the existence of a legal obligation continuing into the tax year is essential to the husband's taxability, it seems clear that such an obligation may arise by virtue of the husband's voluntary assumption of a continuing duty to support just as effectively as by the force of statute or an order of court. If the husband, in contemplation of divorce, sets up a trust by which he personally guarantees a stipulated income to the wife, the trust indenture itself constitutes a continuing obligation which renders the husband taxable upon the income used to discharge that obligation, irrespective of the wife's right to alimony. Relief from an ordinary contractual obligation to pay money constitutes taxable income to the obligor no less than relief from an involuntary obligation imposed by law. * * *

"This theory, which unhappily has often been applied without any clear articulation in the decisions themselves, seems a wholly reasonable approach. * * * The contractual theory of the cases under discussion is reminiscent of the early Treasury rulings upon this subject, taxing the husband where the alimony trust was created only as collateral security for the performance of a continuing duty of maintenance. A highly technical argument might be advanced to the effect that so long as the trust income is equal to the annual amount guaranteed by the husband, no actual obligation on the part of the husband has arisen, and therefore no taxable relief from an obligation has occurred. Still the very absence of such an existing obligation would, even under this view, be due directly to the trust income; and the husband, in being protected from the obligation, has thus received an economic benefit which may fairly be taxed to him."

Paul, Five Years With Douglas v. Willcuts, 53 Harvard Law Review 1, 9–12

In addition it is to be observed that there is no economic distinction between a guaranty of a trust income from a trust established simultaneously by the guarantor and the establishment of a trust to meet a direct obligatory payment (in, say, the form of an annuity) of the same amount as guaranteed. Both result in payments which are not only secured by the income from certain specific assets of the "settlor" (the trust corpus) but also rest on his credit, and, by that token, ultimately upon all his assets. Thus the debtor-creditor relation envelopes and dominates the settlor-cestui qui trust relation. That being so, the rule of Douglas v. Willcuts, 296 U.S. 1, 56 S.Ct. 59, 80 L.Ed. 3, 101 A.L.R. 391, should and does apply equally in both cases to forestall the circumvention, by use of the trust device, of the non-deductibility of debt payments, Helvering v. Blumenthal (debtor-settlor), 296 U.S. 552, 56 S.Ct. 305; 80 L. Ed. 390; Glendinning v. Comm., 3 Cir., 97 F.2d 51 (settlor-guarantor). Finally, the fact that trust and guaranty are contemporaneous rules out any distinction on the theory that the trust is a "fait accompli" and as such precludes the possibility of such avoidance.

The decision of the Board of Tax Appeals is reversed in part and affirmed in part in accordance with this opinion.