Karl F. KNETSCH and Eva Fay Knetsch

v.

The UNITED STATES.

No. 323-62.

United States Court of Claims.

July 16, 1965.

---

Nola McLane, Phoenix, Ariz., for plaintiffs. W. Lee McLane, Jr., Phoenix, Ariz., of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Edward S. Smith, Cynthia Holcomb and Lyle M. Turner, Washington, D. C., of counsel.

Before LARAMORE, DURFEE, DAVIS and COLLINS, Judges, and WHITAKER, Senior Judge.

LARAMORE, Judge.

In 1960, the Supreme Court in Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128, put an end to one more of the growing number of "tax saving schemes"[1] which are designed to lure high income bracket taxpayers with the promise of substantial tax savings at a relatively small out-of-pocket cost. The case at bar presents another facet of the same transaction, involving the same taxpayers in which they seek to effectuate a tax recovery of their out-of-pocket losses in the year the unsuccessful scheme was abandoned. In this instance, a number of insurance companies put forth a plan for selling annuity contracts based on the tax advantage derived from the omission of annuities from the treatment accorded single-premium life insurance or endowment contracts. Under the plan devised, the annuity was "sold for a nominal cash payment with a loan to cover the balance of the single-premium cost of the annuity" and "[i]nterest on the loan (which may be a nonrecourse loan) is then taken as a deduction annually by the purchaser with a resulting tax saving that reduces the real interest cost below the increment in value produced by the annuity."[2] This was made possible because the Federal income tax laws, as enacted by Congress prior to 1954, did not disallow, as it did in the case of single-premium life insurance or endowment contracts, the interest purportedly paid to purchase or carry single-premium annuity contracts.[3]

The prospective purchasers, in this instance Mr. Knetsch, would be shown private letter rulings, which had been secured by an officer of the insurance company, indicating that in the purchase of an annuity contract identical to the one offered, the interest payments would be deductible under section 23(b) of the Internal Revenue Code of 1939. These taxpayers, unsophisticated in the complexities of our tax laws, would enter into these transactions with the belief that the deductibility of the interest charges would never be questioned by the Internal Revenue Service.

Congress became aware of this scheme, and in 1954 enacted section 264(a) (2) of the Internal Revenue Code of 1954 which closed this loophole in our tax laws by denying the deductibility of the interest charges in the purchase of single-premium annuity contracts. However, the denial of the interest deduction applied to annuity contracts purchased after March 1, 1954.

On March 17, 1954, the Commissioner of Internal Revenue issued Revenue

---

1. For other similar tax saving schemes see Eli O. Goodstein, 30 T.C. 1178, affirmed on other grounds, 267 F.2d 127 (1st Cir. 1959); MacRae v. Commissioner of Internal Revenue, 294 F.2d 56 (9th Cir. 1961); Kaye v. Commissioner of Internal Revenue, 287 F.2d 40 (9th Cir. 1960); Gerstell v. Commissioner of Internal Revenue, 319 F.2d 131 (3d Cir. 1963); Lewis v. Commissioner of Internal Revenue, 328 F.2d 634 (7th Cir. 1964); Dooley v. Commissioner of Internal Revenue, 332 F.2d 463 (7th Cir. 1964); Jockmus v. United States, 335 F.2d 23 (2d Cir. 1964). All these cases involve unsuccessful efforts to simulate borrowings and payment of interest. See also Malden Knitting Mills, 42 T.C. 769 (1964); Empire Press, Inc., 35 T.C. 136 (1960); Gold, 41 T.C. 419 (1963); Cahn, 41 T.C. 858 (1964) involving purchase and short sale of phantom shares.

2. H.R.Rep.No. 1337, 83d Cong., 2d Sess. 31 (1954); S.Rep.No. 1622, 83d Cong., 2d Sess. 38 (1954), U.S.Code Congressional and Administrative News 1954, p. 4056.

3. Congress, in 1942, first denied a deduction for amounts paid on indebtedness incurred to purchase single-premium life insurance and endowment contracts (§ 129 of the Revenue Act of 1942, 56 Stat. 798, 827, amending § 24(a) of the Internal Revenue Code of 1939. This provision was enacted "to close a loophole" in our tax laws. See Hearings before Senate Finance Committee on H.R. 7378, 77th Cong., 2d Sess., p. 54. Prior acts did not specifically deny the deduction; e.g., § 23(b) of the Revenue Act of 1934, 48 Stat. 680, 688; § 23(b) of the Revenue Act of 1936, 49 Stat. 1648, 1659; § 23(b) of the Revenue Act of 1938, 52 Stat. 447, 460; § 23(b) of the Revenue Act of 1939, 53 Stat. 1, 12.

Ruling 54–94 [4] which revoked prior issued private rulings and denied the deductibility of interest charges for *all* annuity contracts, including those acquired on or before March 1, 1954. The basis for the denial, said the Commissioner, was that there was not, in such cases, in substance, any borrowing of money by the annuity purchaser. The Supreme Court, in Knetsch v. United States, supra, upheld the Commissioner's position. By finding that there was no economic substance to the transaction "beyond a tax deduction" and consequently a "sham," the Court laid to rest the issue whether the amounts paid constituted "interest paid * * * on indebtedness" within the meaning of section 23(b) of the 1939 Code and section 163(a) of the 1954 Code. There remains the question whether these same taxpayers can have a tax recovery on their out-of-pocket costs in the year (1956) when they abandoned this unsuccessful scheme.

In the instant case, the claimed loss is computed as follows:

Amounts paid to the company:
```
        Cash paid at time of purchase .............$   4,000
        Interest payments to company—
              1953...... $143,465
              1954......  147,105
              1955......  150,745                  441,315
        Total paid to company ...........................   $445,315
Less:
        Amounts received from company as loans:
              1953...... $ 99,000
              1954......  104,000
              1955......  104,000                $307,000
        Net cash value upon surrender ..............   1,000
           Total received from company ....................   308,000
        Net out-of-pocket cash loss ....................:.......   $137,315
```

In arguing for a tax recovery of the out-of-pocket costs, taxpayers invoke four separate grounds which they claim require us to rule in their favor. They argue that the loss realized in 1956 on the surrender of the annuity contracts is a recognized loss under section 165 (c) (2) of the 1954 Code which provides that individuals may deduct losses sustained "in any transaction entered into for profit." Alternatively, they claim that the out-of-pocket expense of $137,-315 is deductible as an ordinary and necessary expense paid for the management, conservation or maintenance of property held for the production of income under section 212 of the 1954 Code.

Taxpayers further claim that the doctrine of equality of treatment of similarly situated taxpayers requires the allowance to them of the deductions for the out-of-pocket expenses. Finally, the taxpayers argue that the government is equitably estopped from disallowing the out-of-pocket costs. We shall treat each contention separately.

The government does not dispute the fact that taxpayers *realized* a loss in 1956; however, they argue that this loss is not *recognized* by section 165(c) (2) of the 1954 Code. With respect to individuals, in addition to the losses incurred in a trade or business, the Code through section 165(c) (2) allows a de-

4. Rev.Rul. 54–94, 1954–1 Cum.Bull. 53.

duction for losses sustained during the taxable year and not compensated for by insurance or otherwise if incurred in any transaction entered for profit though not connected with a trade or business.[5]

The government first argues that the "loss" these taxpayers sustained is not a "loss" in the sense in which that term is used in section 165, since a "loss" normally connotes an involuntary result as distinguished from a planned expenditure which is incurred with no hope of a greater return. The government points out that we have required that "[a] loss, in order to be deductible under the statute, must be an unintentional parting with something of value." Dresser v. United States, 55 F.2d 499, 510, 74 Ct.Cl. 55, 77, cert. denied 287 U.S. 635, 53 S.Ct. 85, 77 L.Ed. 550 (1932). From this it argues that when taxpayers made their payments they knew that the payments would be less than their receipts. In other words, the alleged interest payments would be more than the amount that they could borrow back during that year.

■ We think that such a construction of the term "loss" is too narrow. By only looking at the taxpayers' expenditures and receipts from the insurance company, it fails to take into account the economic advantage that would have been derived either from the allowance of the interest deduction or the increase in the cash value of the annuity. In other words, the loss, although measured by subtracting the expenditures from the receipts, was incurred either as a result of the disallowance of the interest deduction, or resulted from the early surrender of the annuity contract. Thus these events are the "unintentional parting with something of value" which we required in Dresser, supra.

■ Although the loss these taxpayers realized is a "loss" within the meaning of section 165, taxpayers fail to meet the second requirement of section 165(c) (2) limiting deductible losses, outside the sphere of the taxpayer's trade or business, to those incurred in "transactions entered into for profit." This limitation first appeared in the Revenue Act of 1916 and it has been construed ever since in terms of taxpayer's state of mind. Weir v. Commissioner of Internal Revenue, 109 F.2d 996, 997 (3d Cir.) cert. denied 310 U.S. 637, 60 S.Ct. 1080, 84 L.Ed. 1406 (1940). The Supreme Court has said that the determinative question is whether the taxpayer's purpose in entering into the transaction was primarily for profit. Helvering v. National Grocery Co., 304 U.S. 282, 289, 58 S.Ct. 932, 82 L.Ed. 1346 (1938). There are two crucial words contained in this test: purpose and profit.

The word purpose carries with it not only taxpayer's intent, but also his motive for entering into the transaction. Thus, you can have a profit intention side-by-side with a nonprofit motive. However, the statutory requirement "for profit" can be satisfied by either. Weir v. Commissioner of Internal Revenue supra, 109 F.2d at 998. By the same token, you can have a prohibited profit motive or intent side-by-side with a legitimate profit motive or intent and meet the statutory requirement.

In the instant situation, two possible motives or intents can be ascribed to these taxpayers when they purchased the annuity contracts. It appears that the dominant intent or motive here was the tax advantage sought to be derived from the deductibility of the purported interest. A secondary purpose would be that the taxpayers in purchasing these

---

5. Section 165 reads in pertinent part as follows:

"§ 165 Losses.

   (a) *General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

   *   *   *   *   *

   (c) *Limitation on losses of individuals.*—In the case of an individual, the deduction under subsection (a) shall be limited to—

   *   *   *   *   *

   (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *."

annuity contracts intended to provide for retirement income. These two purposes are not mutually exclusive and, moreover, would produce two different kinds of "profit." The tax advantage purpose would produce a profit measured by the tax savings secured by the allowance of the purported interest deduction. The other would be measured by the increase in the "net cash" value of the annuity at any given date.

We turn now to the question whether these two types of "profit" motives are the profit seeking activities which section 165(c) (2) requires. The word "profit" for purposes of this section, has been defined as "the advantage or gain resulting from the investment of capital, or the acquisition of money beyond the amount expended; a pecuniary gain." Goldsborough v. Burnet, 46 F.2d 432, 433 (4th Cir. 1931). See also DuPont, 36 B.T.A. 223 (1937). Feine v. McGowan, 188 F.2d 738 (2d Cir. 1951). However, we think that section 165(c) (2) was not designed to be a catch-all provision allowing taxpayers to deduct any out-of-pocket expenditures. The Third Circuit has limited the deduction for losses to transactions which were designed to achieve and intended to secure the production of taxable income. The court reasoned that:

> * * * the fundamental object of the statute is discernible. As stated by Mr. Justice Stone speaking for an [sic] unanimous court: "Section 214 [now section 165 of the 1954 Code] read as a whole, discloses plainly a general purpose to permit deductions of capital losses wherever the capital investment is used to produce taxable income." Heiner v. Tindle, 276 U.S. 582, 585, 48 S.Ct. 326, 327, 72 L.Ed. 714 * * *. See also, Dresser v. United States [55 F.2d 499, 74 Ct.Cl. 55], * * *. In other words, the gevornment says to the taxpayer with shrewd benevo-

lence, "If you intend to benefit us by producing taxable profits, you may take your loss, but if you don't intend to so benefit us, you cannot deduct your losses and we, furthermore will tax you on your windfalls." The benefit of increased revenue is certainly not assured when there is no intention to profit. [Weir v. Commissioner of Internal Revenue, supra, 109 F.2d at 998]

Under this test, the motive to effect a tax reduction cannot produce a transaction entered into for profit in the statutory sense since the profit measured by the tax savings that would be produced if the transaction was successful, would not be taxable income. On the other hand, the intent to use the annuity contract as a means of securing retirement income would be a transaction entered into for profit within the meaning of this section, since under certain circumstances the proceeds paid beyond cost would be taxable income to the recipient. See I.T. 3576, 1942–2 Cum.Bull. 105, as modified by Rev.Rul. 61–201, 1961–2 Cum. Bull. 46, stating that a loss realized upon the surrender or forfeiture of an annuity contract is deductible as an ordinary loss under section 165.

We need not rely solely on the Third Circuit's test in determining that a transaction is not one entered for "profit" in the statutory sense if the only economic gain derived therefrom results from a tax reduction. The doctrine of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) requires that:

> * * * in construing words of a tax statute which describe commercial or industrial transactions we are to understand them to refer to transactions entered upon for commercial or industrial purposes and not to include transactions entered upon for no other motive but to escape taxation.[6]

---

6. Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., 176 F.2d 570, 572 (2d Cir. 1949) (Judge Learned Hand writing for the court.)

See also Diggs v. Commissioner of Internal Revenue, 281 F.2d 326 (2d Cir. 1960).

Therefore, the statutory word "profit" cannot embrace profit seeking activity in which the only economic gain derived therefrom results from a tax reduction. In other words, there can be no deductible loss allowed under section 165(c)(2) if the transaction which gave rise to the loss has been determined to have been "without economic substance" or a "sham."

■ Taxpayers rely on Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127 (1st Cir. 1959); Lynch v. Commissioner of Internal Revenue, 273 F.2d 867 (2d Cir. 1959). In Goodstein the First Circuit was faced with an effort similar to that in Knetsch to simulate borrowings and payments of interest. The Tax Court had denied the taxpayer's claimed interest deduction on the ground that the transaction lacked "economic substance" and also denied the taxpayer's alternative claim of a deduction for the loss suffered in the transaction, stating that the said outlay "was paid as a fee * * * for the purpose of obtaining a tax benefit" and as such not deductible.[7] Upon review the First Circuit disagreed with the Tax Court's denial of the claimed loss deduction, although it affirmed the Tax Court's holding that the underlying transaction lacked substance and, therefore, the interest was not deductible. The court was of the view that "this amount was actually expended by the taxpayer in connection with a transaction which, although it did not result in the purchase of Treasury notes or the borrowing of money, did create a bilateral contract between * * * [the parties]."[8] However, the court was of the view that the transaction was not completed in the taxable year and, consequently, the expenditure could not be deducted as a loss for that year but rather must be classified as an item of cost to be considered in the taxable year when the transaction was finally completed.[9] The Second Circuit, in Lynch v. Commissioner of Internal Revenue,[10] has indicated its agreement with this conclusion. It appears that the rationale of these two cases is that expenses, although incurred in connection with transactions which had been entered into solely for the purpose of avoiding tax, are deductible if the expenditure gives rise to a contractual obligation, which if carried out would give rise to a profit or a loss. These cases have been criticized by the Seventh Circuit in Lewis v. Commissioner of Internal Revenue,[11] on the grounds that they overlook the fact that the contractual obligation (the option contracts) as well as the interest payments, were shams. We think that the reasoning in Goodstein is correct if the reviewing court is not faced with the factual determination that the contractual obligation was *not* itself a sham. The Tax Court in Fabreeka Products Co.[12] has implicitly noted this distinction and held that *bona fide* expenses incurred in connection with transactions which had been entered solely for the purpose of avoiding tax, are deductible. The court reasoned that:

> * * * [t]he substance versus form rule requires us to treat the totality of steps as the declaration and payment of a nondeductible dividend, but in the course of unsuccessfully attempting to convert it into deductible amortization petitioner did actually incur expenses which, standing alone, must be allowed as deductions. Thus, it seems clear that the taxpayer in Gregory v. Helvering, 293 U.S. 465 [55 S.Ct. 266, 79 L.Ed. 596], would not have been denied a deduction for legal fees merely because the course of the action advised by the lawyer backfired. True, the transaction in the Gregory case failed to qualify as a "reorganization" because of lack of

---

7. 30 T.C. 1178, 1192 (1958).

8. 267 F.2d at 131–132.

9. Ibid.

10. 273 F.2d 867, 872 (2d Cir. 1959).

11. 328 F.2d 634 (7th Cir. 1964).

12. 34 T.C. 290 (1960); see also Jack Sherman, 34 T.C. 303 (1960).

business purpose, but this doesn't mean that the component steps are to be completely ignored for all purposes. * * * Petitioner in the instant case actually borrowed money and is entitled to deduct the interest paid thereon. * * * We know of no rule of law applicable here that is comparable to the "public policy" rule in the case of expenses relating to illegal acts.

We think that the reasoning of Fabreeka Products is valid since the deductible expenditures for interest, stamp taxes, legal and accounting fees *were real,* although the overall transaction was considered a sham. The Goodstein and Lynch cases are an extension of this principle since the contracts there gave the taxpayer the right to buy Treasury notes, which could still be exercised, and until completed there could still be a possibility of gain or loss. However, they are dependent on a finding that these contractual rights were not "shams."

▆ The same reasoning can apply to the instant situation; *i. e.,* in order for the realized loss to be recognized under section 165(c) (2), the permissive profit motive previously discussed is required. Thus taxpayers here are required to show that they intended, when they purchased their annuity contract, to realize a profit through the increase in the cash value of the annuity contract apart from the tax savings.

▆ It appears that the taxpayers' only motivating factor was the tax deduction. The findings by the trial court in the original Knetsch case reflects this, 361 U.S. at 364–365, 81 S.Ct. 132. It is immaterial that the Supreme Court in reaching its decision set the motive factor aside. It was not a necessary factor for its decision. However, this does not mean that the finding in any way has lost its validity. Moreover, that these taxpayers did not intend to use the profit feature of these annuities is apparent from the fact that their equity in this annuity contract was never more than a nominal amount, "because each year Knetsch's annual borowings kept the net

cash value, on which any annuity or insurance payments would depend, at the relative pittance of $1,000." 361 U.S. at 366, 81 S.Ct. at 135. This conclusion is also reflected by the Supreme Court's statement that "it is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction." Taxpayers argue as evidence of the permissive profit motive that in ten years the net cash value of the bonds would have exceeded the amounts paid as interest. This contention, however, as the Supreme Court recognized, "is predicated on the wholly unlikely assumption that Knetsch would have paid off in cash the original $4,000,-000 'loan.'" 364 U.S. at 366, footnote 3, 81 S.Ct. at 135. Thus, the objective facts in this case, which can be used as indicators of the taxpayers' profit intention, show that they never intended to realize a profit on the transaction separate and apart from the tax benefits they hoped to derive therefrom. Under such circumstances, we hold that the loss taxpayers realized is not recognized as a loss incurred in a transaction entered for profit within the meaning of section 165 (c) (2).

▆▆ Taxpayers argue that it was necessary for them to make the so-called interest payments in order to preserve their rights under the annuity contracts, which might otherwise be cancelled. From this premise they conclude that the out-of-pocket expense of $137,315 is deductible as an ordinary and necessary expense paid for the management, conservation or maintenance of property held for the production of income under section 212(2) of the 1954 Code. Deductions under section 212(2) of the Internal Revenue Code of 1954 depend upon whether the expenditures arise "in connection with the taxpayer's profit-seeking activities." United States v. Gilmore, 372 U.S. 39, 48, 83 S.Ct. 623, 629, 9 L.Ed. 2d 570 (1963). Since we have determined that taxpayers' "profit" motives are not the profit seeking activities contemplated by the statute under section 165(c) (2), the same will be true with

respect to section 212. Therefore, taxpayers are not entitled to a deduction under section 212 for their net out-of-pocket expenses.

■ As a basis for their estoppel argument, taxpayers claim that the Commissioner of Internal Revenue stated before a subcommittee of the House of Representatives on January 18, 1957, that individuals would be allowed their out-of-pocket expenditures in transactions of the Knetsch type where they have relied on private rulings issued to others.

Taxpayers recognize that they may not properly rely on the private rulings issued to other individuals as a basis for estoppel as to them. E. g., Bornstein v. United States, Ct.Cl., 345 F.2d 558, decided May 14, 1965; Minchin v. Commissioner of Internal Revenue, 335 F.2d 30 (2d Cir. 1964) and cases cited therein. However, they urge that the answers to questions by a Revenue Service official before a congressional committee in 1957 results in an estoppel in their favor and against the government.[13] Assuming that such statements covered taxpayers' case, they were uttered from two to four years after taxpayers had spent the out-of-pocket moneys for which they now seek deductions. We have recently stated that "[d]etrimental reliance is an essential ingredient of estoppel." Bornstein v. United States, supra, 345 F.2d p. 563. Taxpayers argue that the necessary reliance took place on January 4, 1961 when they paid the tax due resulting from the disallowance by the Commissioner of the claimed out-of-pocket loss for 1956. There is no merit to taxpayers' contention since it is irrelevant that they paid the amount of the proposed deficiency in 1961 in alleged reliance on those statements. Payment of the proposed deficiency was no more than a prerequisite

to jurisdiction in a forum other than the Tax Court. Therefore, we conclude there is no factual basis for estopping the government in favor of taxpayers.

■ Taxpayers' final contention is that the doctrine of equality of treatment requires the allowance to them of deductions for the net out-of-pocket loss realized in the transaction. Insofar as taxpayers' contention is that there is prejudicial discrimination because of a difference in treatment in favor of those who received and relied upon private rulings issued to them as against the instant taxpayers who neither applied for, nor received, a ruling of their own but relied solely on the private ruling issued to other taxpayers, we think there is no merit to such a contention. The same argument has been made by a number of other taxpayers who engaged in the same kind of annuity scheme and has been uniformly rejected by the courts. Weller v. Commissioner of Internal Revenue, 270 F.2d 294 (3d Cir. 1959); Gerstell v. Commissioner of Internal Revenue, 319 F.2d 131 (3d Cir. 1963); Carpenter v. Commissioner of Internal Revenue, 322 F.2d 733 (3d Cir. 1963); Minchin v. Commissioner of Internal Revenue, 335 F.2d 30 (2d Cir. 1964). The same argument has been recently rejected by the Supreme Court in Dixon v. United States, 85 S.Ct. 1301 at pp. 1304–1306 decided May 3, 1965. We also rejected it in our decision in Bornstein v. United States, supra.[14]

■ Taxpayers' remaining basis for their claim of prejudicial discrimination is that other taxpayers who did not apply for or receive rulings, but who relied to their detriment upon rulings issued to others, were allowed to deduct their out-of-pocket costs. Taxpayers' factual basis for their claim is a statement made by Revenue Service official Harold T.

---

13. Progress Report of the Subcommittee on Internal Revenue Taxation to the Committee on Ways and Means, April 22, 1957, at page 192 (hereinafter referred to as Progress Report).

14. As the court pointed out in Bornstein, supra, our decision in International Business Machines Corp. v. United States, Ct. Cl., 343 F.2d 914, decided April 16, 1965, rested in section 7805(b) of the Internal Revenue Code, of 1954, and was based on the court's evaluation of the particular circumstances in that case.

Swartz in 1957 at a hearing before a congressional committee. We quote the relevant part of this testimony:

> With reference to the nonretroactive application denying the interest deduction to people who relied on our private rulings, we were uniform in applying it nonretroactively to the extent we felt they had relied upon it to their detriment. In other words, we would allow them a deduction for the out-of-pocket money they had spent, not the full interest deduction, but the extent to which they had relied on it to their detriment. Our statement of policy with reference to nonretroactive application of a ruling is only where the taxpayer had relied on it, and only to the extent he relied on it to his detriment and was out of pocket. We allowed a deduction to the extent of the net out-of-pocket expense. [Progress Report, supra, p. 197]

If a policy or practice may be inferred from the testimony of Mr. Swartz, it seems clear that taxpayers do not fit within such policy and a denial of their claim does not constitute unlawful and prejudicial discrimination.

Taxpayers are not seeking net out-of-pocket interest deductions for the year when paid, but they are seeking out-of-pocket loss on the cancellation of their annuity in 1956. But nothing in the policy statement taxpayers rely on authorizes this, and taxpayers have not shown that any other taxpayer has been allowed a deduction for out-of-pocket cost or loss on the cancellation of the annuity contract similar to the one here in issue.

Mr. Swartz did not testify that it was the policy of the service to allow deduction of a loss on cancellation of the annuity. His testimony was that under the appropriate circumstances to which he referred, the Service would allow a deduction for part of the interest claimed. Under such circumstances, we hold there was no discrimination with respect to these taxpayers. Therefore, we need not reach the question of taxpayers' right of recovery if they had proved discrimination. Cf., International Business Machines Corp. v. United States, supra; Exchange Parts Co. v. United States, 279 F.2d 251, 150 Ct.Cl. 538 (1960); Connecticut Ry. & Lighting Co. v. United States, 142 F.Supp. 907, 135 Ct.Cl. 650 (1956).

For the foregoing reasons, plaintiffs are not entitled to recover. Defendant's motion for summary judgment is granted; plaintiffs' motion for summary judgment is denied, and the petition is dismissed.