MID-CONTINENT SUPPLY CO., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1429–75.    Filed October 18, 1976.

*Whitfield J. Collins,* for the petitioner.
*Robert M. Smith,* for the respondent.

### OPINION

FEATHERSTON, *Judge:* Respondent determined deficiencies in the amounts of $532,874.53 and $126,178.29 in petitioner's Federal income tax for 1969 and 1970, respectively. Petitioner did not contest the determination of the deficiency for 1969; other issues having been settled by the parties, the issues remaining for decision as to the 1970 taxable year are as follows:

(1) Whether the foreign tax credit allowable in respect of Western Hemisphere trade corporation members of an affiliated group of petitioner's corporations filing a consolidated Federal income tax return for 1970 should be reduced from $442,639.96 to $323,861.95, or by a total of $118,778.01, by reason of the application of the limitation imposed by section 1503(b)(1).[1]

(2) Whether the Court abused its discretion in denying a motion for a continuance of the trial, filed by petitioner to obtain time to seek through discovery a technical advice memorandum, and facts relating thereto, allegedly issued by the National Office of the Internal Revenue Service.

All the facts are stipulated.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

Mid-Continent Supply Co. (hereinafter referred to as petitioner or Midco), the parent corporation of a group of affiliated corporations, and subsidiaries filed a consolidated Federal income tax return for 1970 with the Director, Internal Revenue Service Center, Austin, Tex. Midco's principal place of business on the date of filing its petition herein was Fort Worth, Tex.

### *Issue 1*

Included in the affiliated group of corporations filing the 1970 consolidated return were four domestic subsidiaries, each of which qualified as a Western Hemisphere trade corporation (hereinafter referred to as a WHTC or collectively as WHTCs)[2] and, as such, for a special deduction under section 922. These WHTC subsidiaries and other members of the Midco group had foreign source income and paid foreign taxes during the year in issue.

The taxable income of each of the four members of petitioner's affiliated group qualifying as a WHTC for 1970, before allowing any section 922 deduction, and the aggregate income of all such members for such year were as follows:

| | |
|---|---|
| Mid-Continent Supply Western Hemisphere Co. | $426,065.11 |
| Loffland Brothers International, Inc. | 143,341.47 |
| Loffland Brothers Co. of Canada | 538,763.58 |
| Midco Caribe Co. | 550,411.93 |
| Aggregate income of WHTC members | 1,658,582.09 |

The United States Federal income tax of the Midco affiliated group for 1970, before allowing any credit under section 901 for taxes paid to foreign countries, was $3,171,341.65, and the United States tax applicable to foreign source income was $1,569,730.01. The foreign taxes available for credit against the United States taxes of the affiliated group for 1970, before applying any limitation, were as follows:

---

[2] In general, a WHTC is a domestic corporation which does all of its business in North, Central, or South America, or in the West Indies, and derives 95 percent or more of its gross income from outside the United States, of which at least 90 percent of such income results from the active conduct of a trade or business.

| | |
|---|---|
| WHTC members | $442,639.96 |
| Non-WHTC members | 997,331.89 |
| Total | 1,439,971.85 |

The aggregate taxable income of all members of petitioner's affiliated group showing net income for the year 1970, before allowing any section 922 deduction for WHTC members, was $12,144,459.38. Some of the non-WHTC members of the Midco affiliated group suffered substantial losses in 1970, and after adjusting for those losses the consolidated taxable income of the group, before allowing any section 922 deduction, was $6,736,875.01.

The special deduction allowed a WHTC under section 922[3] is computed by multiplying the taxable income of that corporation by a fraction, the numerator of which is 14 percent and the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year as prescribed by section 11. During the year in controversy, section 51(d)(3) imposed a 2.5-percent surcharge (bringing the denominator of the fraction to 49.2 percent). Where consolidated returns are filed, the consolidated section 922 deduction for the taxable year is determined under section 1.1502–25(a), Income Tax Regs., by multiplying this fraction by "that portion of the consolidated taxable income attributable to those members of the group which are Western Hemisphere trade corporations for such year." Section 1.1502–25(c), Income Tax Regs., defines that portion of the consolidated taxable income as follows:

(c) *Portion of consolidated taxable income attributable to Western Hemisphere trade corporations.*—(1) *In general.* For purposes of paragraph (a) of this section, the portion of the consolidated taxable income attributable to those members of the group which are Western Hemisphere trade corporations is an amount equal to the consolidated taxable income (computed without regard to the section 922 deduction) multiplied by a fraction, the numerator of which is the sum of the taxable incomes of those

---

[3] SEC. 922. SPECIAL DEDUCTION.

In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows—

(1) First determine the taxable income of such corporation computed without regard to this section.

(2) Then multiply the amount determined under paragraph (1) by the fraction—

(A) the numerator of which is 14 percent, and

(B) the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11.

members which are Western Hemisphere trade corporations, and the denominator of which is the sum of the taxable incomes of all the members.[4]

The portion of consolidated taxable income attributable to WHTC members of petitioner's affiliated group in 1970 for purposes of calculating the consolidated section 922 deduction was 13.657109 percent (i.e., $1,658,582.09÷$12,144,459.38) of $6,736,875.01 or $920,062.36.[5] The parties agree that the consolidated section 922 deduction for 1970 was 14/49.2 percent of $920,062.36 or $261,806.36.

In order to prevent double taxation of income which is taxed by a foreign country, a corporation is allowed generally to take a credit against its United States taxes for the amount of the tax paid to all foreign countries taxing its income. See sec. 901. A fundamental limitation on the foreign tax credit allowed against domestic tax liability, however, is found in section 904(a)(2).[6] This limitation may be computed in one of two ways: (1) The per-country limitation or (2) the overall

---

[4] Sec. 1.1502–25(c)(2), Income Tax Regs., defines "taxable income," as used in the above provision, as follows:

(2) *Taxable income.* For purposes of this paragraph, the taxable income of a member shall be the separate taxable income determined under section 1.1502–12, adjusted for the following items taken into account in the computation of consolidated taxable income:

(i) The portion of the consolidated net operating loss deduction, the consolidated charitable contributions deduction, and the consolidated dividends received deduction, attributable to such member;

(ii) Such member's net capital gain (determined without regard to any net capital loss carryover attributable to such member);

(iii) Such member's net capital loss and section 1231 net loss, reduced by the portion of the consolidated net capital loss attributable to such member; and

(iv) The portion of any consolidated net capital loss carryover attributable to such member which is absorbed in the taxable year.

If the computation of the taxable income of a member under this subparagraph results in an excess of deductions over gross income, then for purposes of subparagraph (1) of this paragraph such member's taxable income shall be zero.

[5] The formula for making this computation, prescribed by sec. 1.1502–25, Income Tax Regs., is discussed in the text, *infra.*

[6] SEC. 904. LIMITATION ON CREDIT.

(a) ALTERNATIVE LIMITATIONS.—

(2) OVERALL LIMITATION.—In the case of any taxpayer who elects the limitation provided by this paragraph, the total amount of the credit in respect of taxes paid or accrued to all foreign countries and possessions of the United States shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

limitation. If a taxpayer elects the overall method (as did Midco in the instant case), taxes paid to all foreign countries are aggregated, and the total amount of foreign tax credit is limited to the ratio of the taxpayer's taxable income from sources without the United States to the group's entire taxable income for that year.[7]

Without some limitation on their use, the section 922 deduction and the section 904(a)(2) overall limitation on the foreign tax credit could be combined by an affiliated group of WHTCs and non-WHTCs (some of whom have foreign source income and pay foreign taxes) filing a consolidated return to obtain a double benefit. The section 922 deduction effectively reduces the United States tax rate on WHTCs' taxable income to 34 percent,[8] and the section 904(a)(2) overall limitation on the foreign tax credit would allow the WHTCs' foreign taxes in excess of the United States taxes computed at this 34-percent rate to be credited against the United States taxes on the foreign source income of non-WHTC members. To prevent this double benefit, section 1503(d)(1), redesignated in Act of February 26, 1964, Pub. L. 88–272, 78 Stat. 19, 113, as section 1503(b)(1), was enacted as a Senate amendment to the House version (H. Rept. No. 1358, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 865) of Pub. L. 86–780, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 720, in S. Rept. No. 1393, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 874, 878.[9] Section 1503(b)(1) is as follows:

---

[7] As explained by H. Rept. No. 1358, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 865, 866:

"The overall limitation in effect treats the taxpayer's income as being divisible into two parts, domestic and foreign. Thus, under this limitation a foreign tax credit is allowed for any foreign income taxes so long as these taxes do not represent more than the U.S. tax rate applied to the taxpayer's total foreign income. ˝ * *˝"

[8] The 2.5-percent surcharge imposed by sec. 51(d)(3) during the year in controversy was only temporarily effective. It does not affect the legal principles controlling the instant case but complicates the articulation of those principles. For the sake of simplicity, the surcharge will be ignored in the discussion which ensues, and the issue will be analyzed in terms of a combined normal and surtax rate of 48 percent.

[9] The Senate committee report (S. Rept. No. 1393, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 874) provides a vivid illustration of the purpose behind sec. 1503(b)(1). The report states at p. 878:

"Under the House bill where a consolidated return is filed, foreign taxes which cannot be credited against U.S. tax; because this lower rate is in effect, can be used to offset U.S. taxes at 52 percent on other foreign-source income where the foreign tax rates involved are not this high. For example, assume that the income of a Western Hemisphere trade corporation is $100 before the imposition of foreign taxes of $45. Assume another domestic corporation also earns $100 in another foreign country and

SEC. 1503. COMPUTATION AND PAYMENT OF TAX.

(b) Special Rule for Application of Foreign Tax Credit When Overall Limitation Applies.—

(1) In general.—If the affiliated group includes one or more Western Hemisphere trade corporations (as defined in section 921), and if for the taxable year an election under section 904(b)(1) (relating to election of overall limitation on foreign tax credit) is in effect, then the amount of taxes paid or accrued to foreign countries and possessions of the United States by such Western Hemisphere trade corporations which may be taken into account for purposes of section 901 shall be reduced by the amount (if any) by which—

(A) the amount of such taxes (or, if smaller, the amount of the tax which would be computed under subsection (a), if such corporations were not Western Hemisphere trade corporations, with respect to the portion of the consolidated taxable income attributable to such corporations), exceeds

(B) the amount of the tax computed under subsection (a) with respect to the portion of the consolidated taxable income attributable to such corporations.

The bone of contention in the instant case is the meaning of the phrase "portion of the consolidated taxable income attributable to such [WHTC] corporations" as used in section 1503(b)(1)(A) and (B). Respondent contends that the phrase refers to a fraction of the consolidated taxable income of the entire group computed in accordance with the formula

---

is subject to the same $45 foreign tax, but that this company is not a Western Hemisphere trade corporation. The Western Hemisphere trade corporation in this case would generally be subject to a U.S. tax (before foreign tax credit) of about $38 (ignoring the surtax exemption). Therefore, in this case only $38 of the $45 of foreign taxes could be credited against U.S. tax, leaving $7 of foreign taxes which cannot be credited. In the case of the other corporation, the U.S. tax before foreign tax credit would be $52 (again ignoring the surtax exemption). Against this could be credited the full $45 tax paid the foreign country, leaving a net U.S. tax of $7. If the income of the two corporations in this example were included in a consolidated return, it would be possible in effect to credit the $7 of foreign tax [which could] not be credited in the case of the Western Hemisphere trade corporation against the $7 of U.S. tax otherwise due in the case of the corporation subject to the 52 percent tax. To prevent this result, the amendments made by your committee provide that foreign taxes which cannot be credited against U.S. taxes in the case of Western Hemisphere trade corporations as a result of the special 14-point-tax differential provided for these corporations may not be used to offset U.S. tax on other foreign-source income either in the current year or in years to which the unused credits may be carried. This is applied only where a consolidated return is filed and only where the overall limitation is used.

"The foreign taxes which may not be taken into account for this purpose are only those which cannot be credited because of the 14-point-tax differential which Western Hemisphere trade corporations have. Thus, if the foreign taxes on $100 of income of a Western Hemisphere trade corporation were $62, the amount in excess of $52 (ignoring the surtax exemption), or $10, would be allowed as a credit against any U.S. tax on other foreign-source income."

prescribed by section 1.1502–25, Income Tax Regs., quoted in pertinent part above, for calculating the consolidated section 922 deduction for WHTCs. Respondent's computation is as follows:

```
Sec. 1503(b)(1)(A) amount:
    Lesser of:
        (1) Foreign taxes paid of $442,639.96 ................    $442,639.96
        (2) United States tax on WHTCs' portion of
        consolidated taxable income without sec. 922
        deduction—49.2% of $920,062.36 =
        $452,670.68
Sec. 1503(b)(1)(B) amount:
    United States tax on WHTCs' portion of
    consolidated taxable income with sec. 922
    deduction—49.2% ($920,062.36 less
    $261,806.36) ............................................    323,861.95
Sec. 1503(b)(1) reduction:
    Excess of sec. 1503(b)(1)(A) over sec. 1503(b)(1)(B)    118,778.01
```

Petitioner does not question the validity of section 1.1502–25, Income Tax Regs., as the rule for measuring the consolidated section 922 deduction but steadfastly maintains that: "The computation of the Sec. 1503(b)(1) limitation stands completely on its own, and is in no way dependent on the computation of the consolidated Section 922 deduction." Petitioner argues that section 1503(b)(1) calls for a mechanical calculation which isolates the WHTCs as a group and aggregates the separate taxable incomes and losses, if any, of the respective WHTC members to arrive at the portion of consolidated taxable income attributable to such members.[10] Petitioner's computation is as follows:

```
Sec. 1503(b)(1)(A) amount:
    Lesser of:
        (1) Foreign taxes paid of $442,639.96 ................    $442,639.96
        (2) United States tax on WHTCs' portion of
        consolidated taxable income without sec. 922
        deduction—49.2% of $1,658,582.09 =
        $816,022.39
```

---

[10] The sec. 1.1502–25(c), Income Tax Regs., definition of "portion of the consolidated taxable income attributable" to the WHTCs contemplates that group members with losses will be treated as having taxable income of zero. The effect of this treatment is to allocate such losses among all the members proportionately. Such formula, as a general rule, is unfavorable to the taxpayer when one or more of the non-WHTCs have losses (as in the instant case) but is favorable to the taxpayer when one or more of the WHTCs have losses. See Peel, Consolidated Tax Returns 94 (2d ed. 1973).

*Sec. 1503(b)(1)(B) amount:*
United States tax on WHTCs' portion of
consolidated taxable income with sec. 922
deduction—49.2% ($1,658,582.09 less
$261,806.36)............................................................ 687,213.66
*Sec. 1503(b)(1) reduction:*
Excess of sec. 1503(b)(1)(A) over sec. 1503(b)(1)(B)    0

We think respondent has the better side of the argument, and we hold that his computation is the correct one.

Section 1503(b)(1) refers to the portion of the "consolidated taxable income" attributable to the WHTCs and not to the aggregate of their separate taxable incomes. The consolidated taxable income of a group of affiliated corporations filing a consolidated return is determined by taking into account not only the separate taxable income of each member of the group but also an extensive list of consolidated income and loss items, including the consolidated section 922 deduction. Sec. 1.1502–11, Income Tax Regs. The tax liability of the group includes, along with other taxes (such as personal holding, accumulated earnings, etc.), where applicable, the tax imposed by section 11 on the consolidated taxable income. Against the tax so computed are allowed the investment and consolidated foreign tax credits, subject to the applicable limitations. See secs. 1.1502–2 and 1.1502–4, Income Tax Regs.

Where the section 904(a)(2) overall limitation on the foreign tax credit is used by an affiliated group of corporations filing a consolidated return, section 1503(b)(1) denies the group the right to credit certain foreign taxes paid by its WHTCs against the United States taxes attributable to the non-WHTCs in the group. The foreign taxes that may not be credited are those taxes in excess of the United States taxes on the WHTCs' portion of the consolidated taxable income but only to the extent those foreign taxes do not exceed the United States taxes which would be imposed on that portion of the consolidated taxable income if those subsidiaries were not WHTCs.[11]

The parenthetical phrase in section 1503(b)(1)(A), referring to the section 1503(a) tax computation, read in conjunction with the corresponding phrase in section 1503(b)(1)(B), creates

---

[11] The foreign taxes paid are converted, according to U.S. methods of computing income, to a foreign tax rate corresponding to the effective U.S. rate on the same income.

a "notch" on the United States progressive tax rate scale between the effective tax rate of 34 percent, applicable to WHTCs as a result of the consolidated section 922 deduction, and 48 percent, the generally effective United States tax rate. This "notch" determines the maximum amount of foreign taxes paid by WHTCs disallowed by section 1503(b)(1) as a credit against United States taxes. Where the average foreign tax rate paid by WHTCs falls on or below the lower limit of this "notch" (i.e., 34 percent and below), the disallowance of foreign tax credit is zero. Where the average foreign tax rate paid by WHTCs falls within the "notch" (i.e., above 34 percent and up to and including 48 percent), the amount of foreign taxes paid above the lower limit of the "notch" is disallowed. And where the average foreign tax rate falls above the upper limit of this "notch" (above 48 percent), the maximum disallowance is extracted by the "notch," but those foreign taxes above the "notch" are eligible for crediting. Thus, the "notch," expressed in terms of dollars and cents, is generally an amount equal to the amount of the United States tax reduction caused by the consolidated section 922 deduction, but the amount of the foreign tax credit disallowed by section 1503(b)(1) cannot exceed the amount of the consolidated section 922 deduction multiplied by the effective United States tax rate of 48 percent.[12]

---

[12] Conf. Rept. No. 2199, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 889, 894, which accompanied the enactment of sec. 1503(d)(1), explained the operation of that section, now sec. 1503(b)(1), as follows:    .

"As under the Senate amendment, the rule provided in this paragraph denies, where the overall limitation is used, the right to credit certain foreign taxes paid by the Western Hemisphere trade corporations against the U.S. taxes on income attributable to corporations in the same affiliated group which are not Western Hemisphere trade corporations. The taxes which may not be credited are those in excess of what the U.S. taxes are for these Western Hemisphere trade corporations (generally resulting in an effective tax rate slightly under 38 percent), but only to the extent these foreign taxes do not exceed the U.S. taxes which would be imposed on these corporations if they were not Western Hemisphere trade corporations (generally resulting in an effective tax rate slightly under 52 percent). Thus if all the Western Hemisphere trade corporations in a consolidated group in the aggregate pay foreign taxes which, in terms of U.S. methods of computing income, result in a tax at the effective rate of, say, 32 percent then paragraph (1) would not come into operation. However, if the effective rate of the tax exceeds 38 percent, then paragraph (1) denies the use of such excess foreign taxes as credits against the U.S. taxes on other foreign income in the consolidated group. However, once this effective rate reaches 52 percent, to the extent of any taxes over this effective rate, the taxes are eligible for crediting. * * * [Fn. refs. omitted.]"

At the time this conference report was written, the effective U.S. tax rate on corporations generally was approximately 52 percent and, correspondingly, on WHTCs was approximately 38 percent, as indicated in this excerpt. The principles

The language "(tax * * * with respect to the portion of the consolidated taxable income attributable to such corporations [if they were not WHTCs])" in section 1503(b)(1)(A) sets, in terms of dollars and cents, the upper limit of the "notch," i.e., the United States tax on the WHTCs' proportionate share of the consolidated taxable income determined without any consolidated section 922 deduction. The language "tax * * * with respect to the portion of the consolidated taxable income attributable to such [WHTC] corporations" in section 1503(b)(1)(B) refers, in terms of dollars and cents, to the lower limit of the "notch," i.e., the United States tax on such portion of the consolidated taxable income calculated with the benefit of the consolidated section 922 deduction. Thus, the upper and lower limits of the section 1503(b)(1) "notch" are inextricably tied to the amount of the consolidated section 922 deduction.

Crucial in determining the amount of the consolidated section 922 deduction and thus, correspondingly, in computing the upper and lower limits of the "notch" is the computation of the "portion of the consolidated taxable income" attributable to WHTCs. For the section 1503(b)(1) limitation to achieve its purpose, that phrase must have the same meaning in both calculations. To compute the section 922 deduction by using one WHTC income figure and then to turn around and compute the upper and lower limits of the credit-limiting "notch" created by section 1503(b)(1) by using another WHTC income figure, derived in a different manner, would be inconsistent. It would disregard the relationship that the consolidated section 922 deduction bears to the section 1503(b)(1) limitation and would rob section 1503(b)(1) of its vitality and purpose.

The "portion of the consolidated taxable income" attributable to WHTCs referred to in section 1503(b)(1)(A) and (B) must be the same amount as the amount used in computing the consolidated section 922 deduction. That amount is precisely defined in section 1.1502–25(c), Income Tax Regs., quoted above, and the same amount must be used in making the section 1503(b)(1)(A) and (B) computations.

---

were unchanged when the effective U.S. tax rate was reduced later to approximately 48 percent and, correspondingly, on WHTCs to approximately 34 percent.

## Issue 2

Petitioner argues on brief that the Court erred in denying its motion filed January 9, 1976, for a continuance of the trial. A continuance was needed, petitioner maintains, to permit discovery of a technical advice memorandum, and facts with regard thereto, allegedly issued by the National Office of the Internal Revenue Service to a field office in connection with the audit of another taxpayer's return. Petitioner hoped to introduce into evidence such memorandum, which deals with the substantive legal issue discussed herein, and to contend that Midco is entitled to the treatment called for in that memorandum. The memorandum, a copy of which was attached to petitioner's motion for continuance, has been the subject of published analysis.[13] The motion for a continuance was denied; the Court ruled that interrogatories served on respondent pertaining to such memorandum need not be answered. The case was tried on January 19, 1976.

The legal arguments in the technical advice memorandum were made with equal force in petitioner's briefs, and we have taken them into account in reaching the foregoing conclusion. Petitioner does not allege that it entered into business transactions in reliance on the technical advice memorandum and could hardly so claim since the memorandum related to another taxpayer and was evidently issued after the close of the taxable year here in dispute. The issue is thus narrowed to whether petitioner is entitled to have an erroneous interpretation, made by the Internal Revenue Service in this highly technical area with respect to another taxpayer's liabilities, followed in the instant case.

We think the following quotation from *Shakespeare Co. v. United States,* 389 F.2d 772, 777 (Ct. Cl. 1968), denying discovery of letter rulings inconsistent with the Government's position in that case, is apposite:

We can find nothing in the record before us to indicate either good cause, relevancy, or that the documents sought appear reasonably calculated to lead to the discovery of admissible evidence, as required by the rules, other than the statement by plaintiff in the attachment to the subpoena previously referred to that the rulings sought are relevant. Nor is there a

[13] Maas, "WHTCs and the Consolidated Foreign Tax Credit," 1 Int. Tax J., No. 2, p. 141 (1975).

showing that the documents sought are material to the issues * * *. We say this in particular because (1) if any letter rulings were contrary to the application of the law, they obviously could not estop the government from correcting them even with respect to the same taxpayer (Dixon v. United States, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957)), and (2) even though a taxpayer receiving a private ruling issued by the National Office of the Internal Revenue Service might be entitled to rely upon it until revoked, no court has held a private ruling binding on the government as against other taxpayers. See Bornstein v. United States, 345 F.2d 558, 170 Ct.Cl. 576 (1965); Knetsch v. United States, 348 F.2d 932, 172 Ct.Cl. 378 (1965), cert. denied, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966); Bookwalter v. Brecklein, 357 F.2d 78 (8th Cir. 1966).

These same principles apply here.

In *Bernard E. Teichgraeber,* 64 T.C. 453, 455 (1975), this Court held that a technical advice memorandum of the same type as the one here involved was not discoverable under Rule 70 of the Rules of Practice and Procedure of this Court.[14] Further, since production of the technical advice memorandum, and facts relating thereto, would have made available no additional material evidence, we think petitioner has not shown that this Court abused its discretion in denying petitioner's motion for a continuance.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[14] Rule 70(b), Tax Court Rules of Practice and Procedure, states in part:

(b) Scope of Discovery: The information or response sought through discovery may concern any matter not privileged and which is relevant to the subject matter involved in the pending case. * * *